**Raul PINTO, Plaintiff-Appellant,**

v.

**STATES MARINE CORPORATION OF DELAWARE, Defendant-Appellee.**

**No. 11, Docket 26317.**

United States Court of Appeals Second Circuit.

Argued Sept. 26, 1961.

Decided Oct. 26, 1961.

Rehearing Denied Nov. 28, 1961.

Theodore H. Friedman, New York City (Henry Isaacson, Jacob Rassner, New York City, of counsel; Theodore H. Friedman, New York City, on the brief), for plaintiff-appellant.

Corydon B. Dunham, New York City, for defendant-appellee.

Before LUMBARD, Chief Judge, and FRIENDLY and SMITH, Circuit Judges.

FRIENDLY, Circuit Judge.

As in Blier v. United States Lines Co., 2 Cir., 1961, 286 F.2d 920, certiorari denied 1961, 82 S.Ct. 32, the principal issue here is whether the charge of an able District Judge with respect to "transitory" unseaworthiness, given shortly before the decision in Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, accords with the principles there stated by the Supreme Court. Although the question may be closer than in Blier, where we sustained Judge Dimock's charge, we find no sufficient basis for distinguishing that decision or, indeed, for coming to any different conclusion apart from it.

Pinto was a seaman aboard the S.S. Clovis Victory, a government owned vessel which defendant operated. While the ship was at sea, the third mate directed Pinto and a helper, Fantroy, to carry a heavy signal light from the wheel-house to the engine room for repairs. In descending the ladder leading into the engine room, Pinto slipped and fell, allegedly sustaining a serious injury to his back. The action, in which Federal jurisdiction was predicated upon the Jones Act, 46 U.S.C.A. § 688, was brought on the "law" side, with a jury trial demanded.

The case was submitted to the jury solely on the basis of unseaworthiness, a claim of negligence having been withdrawn by the plaintiff. The jury found for defendant, and judgment was entered accordingly. Only two of the three theories of unseaworthiness advanced below require consideration here[1]—"operating" unseaworthiness, in that some other method should have been adopted for conveying the light to the engine room, and unseaworthiness based on the alleged presence of grease or oil on the step of the ladder where Pinto slipped. Plaintiff claims error in the charge as to both; we find it in neither.

■ (1) The judge characterized plaintiff's claim of operating unseaworthiness as going "to the competency of the third mate in issuing the instructions to plaintiff and Fantroy to carry the blinker light down the particular stairway and in failing to supervise their activity." He reviewed the testimony of plaintiff's expert "that good seamanship required" that if Pinto and Fantroy were to carry the blinker light down the ladder, "they should have been under the direct supervision of a superior officer," but that in fact "it was unsafe to take anything down as heavy as the light without the aid of a block and fall." He then summarized defendant's evidence that the method was perfectly proper, that indeed "the third mate applied an excess of caution" in supplying a helper, and that the light "well could have been carried down by the plaintiff himself, just as the mate had done earlier." After noting what might seem the anomaly that "this conflict as to an approved and accepted method of carrying the blinker light" should be left to a jury of laymen to resolve, he then made the only remark now criticized:

"But actually, you are called upon to decide if the third mate was equal in seamanship to the ordinary men of his calling."

1. The third was that the step on which Pinto fell was worn and slick; no complaint is made with respect to the charge on that score and the fact thus must be taken as established for the defendant by the verdict.

Plaintiff claims this to be error since, as he contends, the issue was not the seamanship of the third mate in general but the propriety of the work procedure directed here. There are several answers. The first is that the quoted sentence may not permissibly be taken in isolation; considering the charge as a whole, the jury must have understood that it was to determine the very issue that plaintiff says it should have been allowed to determine. That would be our interpretation even if the portion of the charge concluding in the sentence under attack stood alone; it is still more so in the light of the judge's earlier characterization of Pinto's claim as being "That the third mate was incompetent, in that he should not have instructed or permitted" two men to carry the lamp but should have supervised their activity and that "good seamanship dictated" use of a block and tackle—"In short, that the third mate failed to measure up to the standard of his calling, and hence the vessel was unseaworthy." Second, if plaintiff's counsel thought the jury might apply the remark now criticized in a manner different from what he believed proper, it was his duty to call the point to the judge's attention; this he did not do. Finally, the charge which plaintiff asserts should have been and, in our view, was given, was more favorable than the law warrants. Gilmore and Black, The Law of Admiralty (1957), 320 say that "The only case which is today clearly outside the scope of the unseaworthiness doctrine is * * * an injury whose only cause is an order improvidently given by a concededly competent officer on a ship admitted to be in all respects seaworthy," citing The Osceola, 1903, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760; Chelentis v. Luckenbach S.S. Co., 1918, 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171; and Imperial Oil Ltd. v. Drlik, 6 Cir., 1956, 234 F.2d 4. Here, of course, the ship was not "admitted to be in all respects seaworthy," but if the other claims of unseaworthiness were determined in favor of the defendant on proper instructions, the same result must follow. On that view, plaintiff, under his claim of "operating" unseaworthiness, was entitled to raise only the mate's overall competence; to the extent that the judge went beyond that, as we think he did, it was the defendant who was entitled to complain.

(2) The evidence whether there was grease or oil on the step was in sharp conflict. The Chief Engineer had found none, either at 1:15 P.M., some forty-five minutes before the accident, or immediately thereafter. The First Assistant Engineer testified that the ladder was constructed of grating, for the precise purpose of keeping any accumulation of oil to a minimum; that the steps had been thoroughly cleaned shortly before noon; and that on an inspection right after the accident, he had found no oil or grease. The Chief Mate, who inspected the ladder a half hour after Pinto's fall, found "the step was absolutely dry"[2]; he had never seen a film of oil on the stairway though he had visited the engine room once or twice daily. As against this, Pinto insisted that he had noticed grease on the step after the injury, and Fantroy corroborated this.

After reviewing the evidence the judge charged as follows:

"Unseaworthiness is a relative concept, dependent in each instance upon the circumstances in which the ship's fitness is drawn in question. In deciding this issue you will of course bear in mind that the accident occurred on the ladder leading to and from the engine room, where the use of oil and grease is required for normal engine room functioning. In this circumstance, the mere momentary presence of oil in the area does not in and of itself render the vessel unseaworthy. Before you can find that the vessel was unseaworthy plaintiff must satisfy you

2. The Third Assistant Engineer testified that no one had wiped anything from the steps before the inspection.

by a fair preponderance of the evidence that the alleged condition of oil or grease, which he claims caused him to slip, was not a momentary phase in the normal progress of work in and about the engine room, but that oil and grease was permitted to accumulate in sufficient quantity so that the vessel was rendered unseaworthy. In other words, it is not required that the vessel have a crew member handy with a rag to wipe off oil the very minute it is placed in an area. A vessel does not become unseaworthy by reason of a temporary condition caused by a transient substance if even so the vessel was as fit for service as similar vessels in similar service. The essential test is whether, considering place and circumstance, the area was reasonably fit to permit Pinto to perform his tasks with reasonable safety. Absolute perfection is not required under the doctrine of seaworthiness. It requires reasonable fitness for intended use."

Plaintiff's counsel excepted on the basis that the judge had charged "in line with the Cookingham decision, that a transitory condition would not impose liability," whereas in fact "whether it was transitory or not wouldn't make any difference on a charge of unseaworthiness."[3]

The judge's statement that "A vessel does not become unseaworthy by reason of a temporary condition caused by a transient substance if even so the vessel was as fit for service as similar vessels in similar service" and the sentences continuing to the end of this portion of the charge are substantially equivalent to what we sustained in Blier v. United States Lines Co., supra. If a different result is to be reached here, it must be on the basis of the judge's earlier statement that "the mere momentary presence of oil in the area [the engine room] does not in and of itself render the vessel unseaworthy" and the two sentences immediately following. To us these are no more than a permissible application of the later general statements to the particular facts. The charge seems to be good sense, and we are not persuaded that Mitchell makes it bad law,—especially when the judge followed the remarks now criticized by saying that "The essential test" was almost precisely what Mr. Justice Stewart was to say two months later, 362 U.S. at page 550, 80 S.Ct. at page 933.

In Mitchell the judge had told the jury that unseaworthiness is "quite similar to negligence" and summed up, 362 U.S. at pages 540–541, footnote 2, 80 S.Ct. at page 928:

"Was there something there and was it there for a reasonably long period of time so that a shipowner ought to have seen that it was removed? That is the question."

The jury could well have regarded that question as containing negligence connotations, and the likelihood that they were intended to do exactly that was emphasized by the refusal of a request "to instruct the jury that notice was not a necessary element in proving liability based upon unseaworthiness of the vessel," 362 U.S. at page 541, 80 S.Ct. at page 928. Indeed, the judge himself later described his charge as having been

3. At the same time oral request was made for a charge "that if the physical condition as it existed at that precise time was not reasonably safe for carrying down a particular blinker light, then they should not be concerned with whether or not the condition was created just a few minutes before or a long time before." The Court declined to grant this "for the reason that counsel were asked to submit requests for instructions under the rules and no such request was submitted." This was proper; the judge is entitled to an opportunity to study written requests in advance of his own charge and ought not be obliged to act on oral ones after his charge has been given. F.R.Civ.Proc. 51, 28 U.S.C.A.; Dallas Ry. & Terminal Co. v. Sullivan, 5 Cir., 1940, 108 F.2d 581, 584; Seeraty v. Philadelphia Coca-Cola Bottling Co., 3 Cir., 1952, 198 F.2d 264; Turner Construction Co. v. Houlihan, 1 Cir., 1957, 240 F.2d 435. Moreover, the request went too far, for reasons later pointed out.

"that the plaintiff could not recover unless the slime had been on the rail long enough for the shipowner to be chargeable with knowledge of it,"—an instruction which, on reflection, he considered to be possibly "inappropriate with respect to the unseaworthiness count" save for special circumstances as to who had been responsible for the slime getting on the rail, 167 F.Supp. 434 (D.C.D.Mass. 1958).[4] The Court of Appeals, characterizing the charge "as requiring proof of the presence of the unseaworthy condition for a sufficient length of time, from which the inference might be drawn that defendant, or his servants, in the exercise of due care, ought to have discovered the presence of the slimy substance and removed it," approved it on the very basis as to which Judge Wyzanski had become doubtful, namely, that in the case of "an unseaworthy condition which arises only during the progress of the voyage * * * the shipowner's obligation is merely to see that reasonable care is used under the circumstances * * * by him * * * incident to the correction of the newly arisen defect." 265 F.2d 426, 427, 432 (1 Cir., 1959). This was the posture in which the case was presented to the Supreme Court.

The Supreme Court thus regarded the case as presenting "the single issue whether with respect to so-called 'transitory' unseaworthiness the shipowner's liability is limited by concepts of common-law negligence," 362 U.S. at page 542, 80 S.Ct. at page 928. The context, as well as the term "so-called," makes it plain that the Court was using "transitory," not in a general sense, but in the special one of what the Court of Appeals had called "an unseaworthy condition which arises only during the progress of the voyage," 362 U.S. at page 542, 80 S.Ct. at page 928, whether of short or long duration, as distinguished from a condition existing at the voyage's inception. That "single issue," previously

much debated in the Courts of Appeals, see 362 U.S. at page 542, 80 S.Ct. at page 928, the Supreme Court settled in the negative. However, in giving a negative answer to the question thus posed and enunciating "a complete divorcement of unseaworthiness liability from concepts of negligence," 362 U.S. at page 550, 80 S.Ct. at page 933, the Court was at pains to make clear that it was not going to the extreme of requiring any such absolute freedom of all parts of a vessel from all foreign substances at all times, as, for example, Interstate Commerce Commission Rule 153 under the Boiler Inspection Act, 45 U.S.C.A. § 23, has been held to demand with respect to locomotives and tenders, Lilly v. Grand Trunk Western R. Co., 1943, 317 U.S. 481, 487–488, 63 S.Ct. 347, 87 L.Ed. 411; Calabritto v. New York, N. H. & H. R. Co., 2 Cir., 287 F.2d 394, certiorari denied 1961, 366 U.S. 928, 81 S.Ct. 1649, 6 L.Ed. 2d 387. The Court said, " * * * the owner is [not] obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use," 362 U.S. at page 550, 80 S.Ct. at page 933, and remanded the case "for a new trial on the issue of unseaworthiness."

What was the question the jury was to try on the remand? Clearly it was not the mere presence or absence of slime and gurry on the rail—if the Supreme Court had meant that, it would have said so. Appellant urges it was whether slime and gurry were present and their presence rendered the ship unseaworthy. In one sense that is so; but what was the jury to consider in answering the latter half of the question? Most jurors would see a difference in the seaworthy condition of a vessel whose rails had been left coated with slime and gurry for hours, and of another, generally spick-and-span, on which a mishap had suddenly created a slippery condition. Must they be told that this distinction,

---

4. The Supreme Court rejected this justification as having "played no part in the issues developed at the trial," 362 U.S. at pages 542–543, footnote 4, 80 S.Ct. at page 929.

relevant in common sense, is irrelevant in law? So here, assuming the engine room steps were so constructed as to keep the hazard of oil accumulation to a minimum, most jurors would see a difference in seaworthiness as between a vessel whose well-constructed steps bore the oil accumulation of days and another whose similar steps had only a film of oil unavoidably accumulated since a cleaning a few hours before. We read Mitchell as saying they may nevertheless hold the owner liable in the latter case, not that they must. What Mitchell did forbid was the Court's instructing them to make any distinction based on whether the condition had or had not arisen until the voyage commenced, or on whether it had or had not been brought home to the owner. The duty may be no "less with respect to an unseaworthy condition which may be only temporary", 362 U.S. at 549, 80 S.Ct. at 932, but the question remains whether such a temporary condition in fact renders the vessel not "reasonably suitable for her intended service", 362 U.S. at 550, 80 S.Ct. at 933.

The Court's decision that it was inconsequential, as a matter of law, that the dangerous condition did not arise until a moment after the sailing did not logically carry with it a conclusion that it was similarly inconsequential, as a matter of fact, that the condition arose only a moment before the accident; whether such a momentary condition would or would not render the vessel unseaworthy would be for the trier of the facts to say. The statement, at page 550 of 362 U.S., at page 933 of 80 S.Ct. that Alaska Steamship Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, "also effectively disposes of the suggestion that liability for a temporary unseaworthy condition is different from the liability that attaches when the condition is permanent" must be read along with the immediately preceding one that the Alaska Steamship "decision is thus specific authority for the proposition that the shipowner's actual or constructive knowledge of the unseaworthy condition is not essential to his liability." A con-

clusion that liability for a temporary condition is not different in legal nature from liability for a permanent one does not mean that the duration of the condition, the measures prescribed for dealing with it, and the feasibility of achieving perfect safety at all times, are irrelevant to deciding whether the owner had met his obligation to furnish "a vessel reasonably suitable for her intended service." 362 U.S. at page 550, 80 S.Ct. at page 933. Poignant v. United States, 2 Cir., 1955, 225 F.2d 595, cited with approval in Mitchell, 362 U.S. at page 550, footnote 12, 80 S.Ct. at page 933, see also, page 542 of 362 U.S., page 928 of 80 S.Ct., had said that a vessel "does not become unseaworthy by reason of a temporary condition caused by a transient substance if even so the vessel was as fit for service as similar vessels in similar service," 225 F.2d at page 598, and even Judge Frank's concurring opinion conceded, at page 602, "that, if defendant were to prove that there were no means, reasonably available, to keep the passageway free of garbage, the existence of the dangerous condition would not have constituted unseaworthiness."

As indicated in Blier v. United States Lines Co., supra, 286 F.2d at page 923, we thus read Mitchell as holding that the trier of the facts is to determine whether the emergence and temporary continuance of a slippery or other hazardous condition does or does not leave a vessel "reasonably suitable for her intended service," 362 U.S. at page 550, 80 S.Ct. at page 933, on the evidence in the case and under the standards of the trade; if that question is answered in the negative, it is then no defense either that the condition had come into existence only during the voyage or, if it had, that it had not existed "for a sufficient length of time, from which the inference might be drawn that defendant, or his servants, in the exercise of due care, ought to have discovered" its presence, 265 F.2d at page 427.

If our understanding of Mitchell is correct, Judge Weinfeld's charge con-

formed to it. The charge cannot fairly be read as importing notions of common-law negligence into the jury's determination of unseaworthiness. Earlier the judge had instructed that "even the exercise of diligence or reasonable care does not relieve the shipowner of the duty to supply a seaworthy vessel," although "the standard to be applied is not absolute perfection, but only reasonable fitness for intended use." His remarks about the special nature of an engine room and the lack of any requirement that the vessel have a crew member in constant readiness to wipe off the most minute accumulation of oil were designed to clarify the meaning of this standard as applied to the case in hand. Nowhere did he suggest that plaintiff must prove that defendant's supervisory personnel knew or ought to have known that oil or grease had accumulated.[5] He left it to the jury to determine "whether, considering place," to wit an engine room, "and circumstance," that is, the evidence as to the special design of the steps "to prevent the accumulation of foreign substances," the practice of cleaning the steps, and the absence of oil or grease shortly before the accident, "the area was reasonably fit to permit Pinto to perform his tasks with reasonable safety."[6] If it be said that a jury inexpert in the ways of engine rooms cannot be expected to determine how much oil, if any, can be tolerated on a step and for how long, without the ship becoming unseaworthy thereby, we answer, much as Judge Medina did in Blier v. United States Lines Co., supra, 286 F.2d at page 926, that this is the kind of thing juries determine all the time. True, the task would be simpler if the jury had only to decide whether a foreign substance was present, but, as we read Mitchell, that is not the standard laid down by the Supreme Court.

Moreover, if the charge were subject to any criticism, we doubt whether the exception was apt to raise it. More specific objection was needed to raise a contention that it was an invasion of the jury's province for the judge to state that the vessel need not "have a crew member handy with a rag to wipe off oil the very minute it is placed in the area," etc.; a contention with which we do not agree. The exceptions that were made were not well taken. The judge had not charged in line with Cookingham v. United States, 3 Cir., 1950, 184 F.2d 213, certiorari denied 1951, 340 U.S. 935, 71 S.Ct. 495, 95 L.Ed. 675, as counsel claimed, but with this Court's decision in Poignant, 225 F.2d at pages 597–598, which had disapproved Cookingham, as so experienced a judge well knew. Neither was there foundation for the accusation that the judge said "a transitory condition would not impose liability," whereas "whether it was transitory or not wouldn't make any difference on a charge of unseaworthiness." Insofar as this meant "transitory" in the technical sense of "post-inception," the charge had been just the opposite of that claimed; and if the more general sense of "momentary" was meant, the judge had said, quite correctly on our reading of Mitchell, that a momentary condition would not impose liability automatically and that the jury was to take the duration of the condition and the feasibility of more complete prevention into whatever account it found appropriate. The same considerations show

---

5. In fact, there was no evidence as to when the grease alleged to have been on the ladder had gotten there. Pinto and Fantroy did not know, and defendant's witnesses denied there was any.

6. The charge differed essentially from that disapproved in Grzybowski v. Arrow Barge Co., 4 Cir., 1960, 283 F.2d 481, distinguished in Blier v. United States Lines Co., supra, 286 F.2d at page 926, where the judge had instructed the jury to consider the absence of previous complaint by the plaintiff or request for corrective action by the ship; we agree with the decision on that basis, although the opinion contains some language with which we do not. Similarly the decision in Puerto Seguro Cia. Naviera, S. A. v. Pitsillos, 4 Cir., 1960, 279 F.2d 599, is not opposed to our view of Mitchell, although certain of the language is; the Court of Appeals simply sustained a permissible finding of unseaworthiness by a judge as trier of the facts.

that counsel's improperly submitted oral request was, on its merits, too broad.

Complaint is also made with respect to certain interrogation with respect to plaintiff's sex activities; this was not improper in the light of statements in the hospital record that had been received in evidence at plaintiff's instance.

Affirmed.

J. JOSEPH SMITH, Circuit Judge (dissenting).

I respectfully dissent, and would reverse on the ground that the charge did not fully anticipate the later Mitchell definition of the extent of the duty to provide a seaworthy ship. The charge here has not applied the same standards to a temporary condition as to a permanent one.

In Blier v. United States Lines Co., 2 Cir., 1961, 286 F.2d 920, certiorari denied 1961, 82 S.Ct. 32, there was, to be sure, mention of a temporary condition, but no indication that the test of seaworthiness was different from that for a permanent condition. Here, the charge makes a distinction absolving the shipowner from liability "if a momentary phase in the normal progress of work," and holds that "it is not required to have a crew member handy with a rag to wipe off oil the very minute it is placed in an area." This seems to me to import a time element into the concept of seaworthiness which time element was rejected by the Supreme Court in Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941. If grease was on this step in a quantity sufficient to make it unfit for use by plaintiff, and he was injured thereby, the damage suffered falls under the Mitchell doctrine upon the ship, not the seaman. It makes no difference whether the grease was there seconds or hours, for the liability is imposed because the ladder was unfit for use, regardless of fault, as a means of distributing the risks of the calling. See Harlan, J., dissenting in Mitchell, 362 U.S. 539, at page 572, 80 S.Ct. 926, at page 944.

On Petition for Rehearing by Panel.

PER CURIAM.

The petition for rehearing by the panel is denied.

J. JOSEPH SMITH, Circuit Judge.

I respectfully dissent.

Before LUMBARD, Chief Judge, and CLARK, WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS and MARSHALL, Circuit Judges.

On Petition for Rehearing in Banc.

PER CURIAM.

The petition for rehearing in banc is. denied.

CLARK, Circuit Judge (dissenting).

Judge SMITH'S compelling dissent points up a developing problem stemming from discontent with the Supreme Court's expansion of the concept of unseaworthiness on the part of those brethren who find themselves in greater sympathy with the views of the dissenters than those of the majority in the quite similar case of Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941. I suggest that a reading of the opinions there, particularly the dissenting opinions, against the opinions herein, will support this conclusion. And the problem is bound to recur often in view of the large number of these cases coming before each panel of our court. The intellectual reaction is understandable, since the minority view was powerfully presented. But whatever we may feel as to the merits of the debate, our duty is surely to apply the presently prevailing law and leave the question of further change to the Court itself. Furthermore, the Court's manifest intent to safeguard human lives at sea and to enforce the shipowner's responsibility by strict liability is not one to combat. But the trend here illustrated toward divergent precedents will make decision increasingly embarrassing for us.

I realize that the in banc device represents at best a temporary palliative, rather than the permanent corrective which can be supplied only by the Court itself. But there are now too many cases to expect the Court to act in all these private

claims in view of its pressing public obligations. And in our recent past we have employed the *in banc* device to correct decisions not accepted by a majority; indeed, among our inconsistent appearing decisions thereto, the one and only thread, quite obviously, has been its use as such a corrective. Failure to resort to it here to resolve a really troublesome division of view I do think ought to have one advantage, namely in freeing us from the bondage of supporting decisions in which we do not believe. I have always believed that judges must have and do have a moderate degree of freedom in this regard, see, e. g., Dunbar v. Henry Du Bois' Sons Co., 2 Cir., 275 F.2d 304, 306, certiorari denied Henry Du Bois' Sons Co. v. Dunbar, 364 U.S. 815, 81 S.Ct. 45, 5 L.Ed.2d 46, though this view seems to have engendered a certain amount of criticism. Chabot v. National Securities & Research Corp., 2 Cir., 290 F.2d 657, 659; Friendly, 109 U. of Pa.L.Rev. 1040, 1045 (1961). Surely we cannot be expected to go contrary to what we believe to be the clear mandate of the Supreme Court by reason of a panel precedent which we thus appear to be powerless to change or modify. But as the more immediate way out of our present self-created dilemma I would vote for deliberation by the entire court.

Judge SMITH concurs in this dissent.