Emilio RODRIGUEZ, Libelant,

v.

COASTAL SHIP CORPORATION and S.S. GATEWAY CITY, Respondents.

United States District Court
S. D. New York.
Oct. 3, 1962.

Goldstein & Sterenfeld, New York City, for libelant; Herbert W. Sterenfeld, New York City, of counsel.

Burlingham, Underwood, Barron, Wright & White, New York City, for respondents and claimant; William M. Kimball, New York City, of counsel.

WEINFELD, District Judge.

Libelant, a longshoreman, was injured while engaged in his duties aboard the S.S. Gateway City, owned by respondent, Coastal Ship Corporation. He was an employee of Sea-Land Service, Inc. (formerly known as Pan Atlantic Steamship Corporation), the bareboat charterer and owner pro hac vice of the vessel. He brings this libel in rem against the S.S. Gateway City and in personam against Coastal Ship Corporation, seek-

ing damages for his injury on claims of negligence and unseaworthiness.

Preliminarily, dismissal is sought of the libel in rem on the ground that there is no underlying in personam liability on the part of either Sea-Land Service, libelant's employer, or Coastal Ship, the owner of the vessel, to support a maritime lien. The employer, of course, is exonerated from personal liability by reason of the exclusive provisions of the Longshoremen's and Harbor Workers' Compensation Act,[1] and Coastal Ship contends that personal liability cannot be visited upon it because at the time of the delivery of the ship to Sea-Land under the bareboat charter the vessel was seaworthy and Coastal Ship had no notice of any hazardous condition.[2] Whether or not in rem liability may be imposed upon a vessel in the absence of in personam liability has led to differing views among various Courts of Appeals, and although the Supreme Court granted certiorari to resolve the conflict, its recent decision did not do so since it rested upon a factual situation.[3] This Court is bound to follow the holding in this Circuit,[4] which permits the in rem proceeding to be maintained under the circumstances here presented.[5]

Thus we proceed to a consideration of the merits, which requires a general description of the vessel, an innovation in seacoast freight transportation.[6] The S.S. Gateway City is a modern ship, the first of its kind, designed to achieve maximum efficiency in loading and unloading of entire trailer bodies. Prior to September 30, 1957, when she was bareboat chartered to Sea-Land, she was converted by her owner, Coastal Ship, from a conventional C-2 type of vessel into what is now referred to as a container ship.[7] She has capacity to carry 226 thirty-five foot long truck trailers which, when coupled to specially built truck chassis on land, become standard highway units for over-the-road transport. Conversely, the highway trailers are unlocked at dock side from the truck chassis and hoisted up and stowed in the ship's hatches. During conversion two self-contained travelling gantry cranes were added to the vessel's superstructure, thus making shore crane facilities unnecessary and eliminating the use of masts, king posts, cargo blocks, cargo runners, cargo winches, hatch beams or hatch boards in connection with cargo operations. One gantry crane is located forward, and the other aft, of the vessel's deckhouse. The cranes, which can be moved athwartship to work on either side, not only lift and lower trailers from the truck chassis dock side, but also can be moved fore and aft to place the trailers in position below and above the main deck of the vessel.

The two gantry cranes working together can unload one trailer from the vessel and place another aboard on a three-minute average. The operation is so efficient that the turn around time of

1. 33 U.S.C.A. § 905.

2. See Grillea v. United States, 229 F.2d 687 (2d Cir. 1956), rev'd on other grounds on rehearing, 232 F.2d 919 (2d Cir. 1956); Cannella v. Lykes Bros. S.S. Co., 174 F.2d 794 (2d Cir.), cert. denied, 338 U.S. 859, 70 S.Ct. 102, 94 L.Ed. 526 (1949).

3. Guzman v. Pichirilo, 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962).

4. Grillea v. United States, 232 F.2d 919 (2d Cir. 1956). Accord, Leotta v. The S.S. Esparta, 188 F.Supp. 168 (S.D.N.Y. 1960). Contra, Reed v. S.S. Yaka, 302 F.2d 255 (3d Cir. 1962); Ruiz Pichirilo v. Maysonet Guzman, 290 F.2d 812 (1st Cir. 1961), rev'd on other grounds, 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962).

5. Judge Learned Hand, in deciding the Grillea case, gave some, but not controlling, consideration to the circumstance that the demisee agreed to indemnify the shipowner against any lien arising out of operations by the demisee. A similar provision is contained in the charter in the instant case.

6. The Court, with the consent and in the presence of counsel, inspected the vessel and observed its operation.

7. Coastal has since converted five other container ships and plans to convert others.

the vessel, including arrival, discharge and reloading of a full load of 226 trailers and departure, is thirty-six hours. The stowing of the 226 trailers is effected as follows: 166 are stacked five high in four hatches forward of the deckhouse and in three aft. These hatches are then covered and twenty-four additional trailers are stowed forward and thirty-six are double tiered aft.

At the starboard aft end of No. 7 hatch is a clamp, a hinged leg-like structure—properly termed a "container guide and security device"—which had been fitted and installed when the vessel was converted. The hinge secures the clamp to the hatch coaming. The purpose of the clamp is to square off and enlarge the top of No. 7 hatch to permit an additional trailer to be stowed and carried on the deck. The No. 7 hatch below main deck level is only wide enough to accommodate four trailers abreast, but above deck, and because the rails on which the gantry crane operates must run straight, the superstructure extends out so that six trailers abreast can be accommodated above the deck. Accordingly, and after the No. 7 hatch is covered with pontoons, the clamp, and others like it, are swung into place in order to support the outboard trailers which are carried on deck at No. 7 hatch. Thus these clamps are raised and lowered as occasion requires—they are swung down to discharge from, and load trailers into, the No. 7 hold; they are raised and then kept in up position while the vessel is at sea. The clamp is about two feet wide, weighs about 150 pounds and generally two men are required to raise or lower it; at times it becomes rusty and a hammer is used to loosen it.

The accident which gives rise to this libel occurred on July 11, 1958 at about 4:20 P. M., when libelant was helping two fellow longshoremen raise the clamp located on the starboard side aft end No. 7 hatch so that a trailer could be stowed in that area. The only witnesses to the accident were libelant and his co-workers, all of whom testified on his behalf. Libelant's co-workers, Rodriguez (not re-

lated to libelant) and Pateiro, were on the deck trying to push the clamp up into proper position, but it became stuck halfway because, as they both testified, the hinges were rusty. They called upon libelant, who was then working midway of the starboard hatch pontoons, to assist. He walked to where the clamp was on the extreme edge of the hatch and, standing on the pontoon, bent over facing the clamp and pulled it upward while the two men pushed from below; the clamp, according to all three, did not readily give; libelant lost his balance, slipped and fell to the deck some seven or eight feet and sustained injuries. Immediately after libelant's fall his two co-workers examined the area where libelant stood in trying to assist them and observed a pool of oil more than a foot in diameter and also a fresh skid footmark. The fellow employees also testified that the gantry crane (which was approximately twenty-two feet about the level of the deck) dripped oil from the engines. Pateiro testified that when he released the pontoons that morning he saw a fresh oil patch of a few feet at the aft and starboard side of No. 7 hatch; that oil continued to drip throughout operations and the accumulation was much larger when the accident occurred than it had been previously; that the oil came from the motor of the gantry crane which had been leaking.

The defense called as its only witness its port engineer, who was familiar with the conversion and construction of the vessel and had sailed aboard container ships as chief engineer. He testified that the gantry crane and other moving parts are lubricated with grease or oil and that lubrication is maintained at a constant level; that in the shifting of the bridge of the gantry crane from one side of the vessel to the other, thousands of parts are involved; and in the movement of the gantry crane fore and aft, hundreds of parts are involved, all of which must be properly and periodically lubricated if they are to function. He readily acknowledged that the resulting oil spillage was a problem both during conver-

sion of the S.S. Gateway City to a container ship and after she had been demised to Sea-Land.

When the vessel was chartered to Sea-Land, she had drip pans which Coastal had installed below the bridge transmission boxes in an effort to reduce oil spillage; however, after her delivery to Sea-Land in September, 1957, but some months prior to the accident, these had been removed by her chief engineer as "not being capable of doing the job." In a further effort to solve the problem the engineer installed angles and drip cans along the gear box, notwithstanding which drippings continued to fall from the crane to various parts of the deck during loading and unloading activities.

There can be little doubt that the operation of the gantry crane above the No. 7 hatch resulted in fairly constant dripping of oil and grease onto the deck and other areas below. Indeed the sole defense witness testified it was "impossible to stop it." The respondents, in effect, concede as much, stating that by reason of the S.S. Gateway City's "unique design and the fact that, during cargo operations, large, highly complex diesel-powered, hydraulic-operated machinery is working back and forth over and above the deck * * * some oil spillage onto the deck and pontoons is inevitable and is impossible to prevent." Thus the issues here posed go beyond the so-called transitory or temporary situations and the problems which arise thereunder.[8]

■ It can hardly be questioned that had the S.S. Gateway City remained a conventional cargo vessel which leaked oil upon her decks and other working areas and which lacked adequate devices to correct or minimize the condition, she would be held unseaworthy. But the respondents and the claimant press that as a reconstructed vessel she and similar container ships are sui generis and are still in the experimental stage; that an inevitable consequence of their functioning is spillage of oil and grease upon the decks and other working areas, and since seaworthiness is a "relative concept," [9] that under the circumstances the vessel was reasonably fit for its intended service. In this connection they boldly urge that "questions of negligence and unseaworthiness with respect to the S.S. Gateway City and her operations cannot be judged by standards applicable to ordinary dry cargo ships." This position suggests that the increased efficiency of the vessel through the construction of the gantry cranes, but with its still unresolved problem of constant oil spillage, is at the expense of the safety of the crew and others engaged in seaman's work, and of their right to a reasonably safe place to work. The plea, in effect, amounts to a negation of the "humanitarian policy"[10] underlying the seaworthiness doctrine and if accepted would revive the now discarded concept of assumption of risk.[11] This Court is unaware of any current authority or doctrine in general maritime law which shifts to the worker the burden of the hazards created by the shipowner's endeavors, experimental or otherwise, to increase the productive earning power of his vessel, thereby relieving the shipowner of his absolute duty to supply and maintain a seaworthy vessel and appurtenances. Indeed, to the contrary, the policy has been to assess the cost of the hazards of marine service, "insofar as it

8. See Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); Pinto v. States Marine Corp., 296 F.2d 1 (2d Cir. 1961), cert. denied, 369 U.S. 843, 82 S.Ct. 874, 7 L.Ed.2d 847 (1962); Blier v. United States Lines Co., 286 F.2d 920 (2d Cir.), cert. denied, 368 U.S. 836, 82 S.Ct. 32, 7 L.Ed.2d 37 (1961).

9. Lester v. United States, 234 F.2d 625, 628 (2d Cir.), cert. granted, 352 U.S. 889, 77 S.Ct. 130, 1 L.Ed.2d 85 (1956), dismissed per stipulation, 352 U.S. 983, 77 S.Ct. 384, 1 L.Ed.2d 366 (1957).

10. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 95, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

11. See Beadle v. Spencer, 298 U.S. 124, 56 S.Ct. 712, 80 L.Ed. 1082 (1936); The Arizona v. Anelich, 298 U.S. 110, 56 S.Ct. 707, 80 L.Ed. 1075 (1936).

is measurable in money," upon the shipowner and not the worker, since he " * * * is in position, as the worker is not, to distribute the loss in the shipping community which receives the service and should bear its cost."[12] The cost of experimental activities and improvement programs to the extent they create dangerous working conditions must be borne by the shipowner and not the seaman.

To be sure, the owner is not required to supply a perfect or an accident-free ship and that the seaworthiness of a vessel involves a relative concept dependent in each case upon time, place and other relevant factors.[13] But the measure by which the seaworthiness of all vessels, traditional or experimental, harbor tug or ocean steamship, is determined is the same—whether the vessel and her appurtenances were reasonably fit for their intended use.[14] The ultimate question is—was she reasonably fit to permit libelant to perform his task with reasonable safety.[15] The fact that the oil spillage problem on container ships has not been resolved, or even that perhaps it cannot readily be solved, does not conclude the trier of the fact on the issue of the Gateway City's seaworthiness. What an industry does or fails to do, while it may have some evidential value, does not establish or diminish the measure of legal duty—an absolute one to supply a seaworthy vessel. Whether or not the shipowner has measured up to that duty is determined by the trier of the fact upon all the evidence of a given case and not by the standards set by industry practice.[16]

Neither does the fact that the libelant offered no expert testimony to show there was a feasible means to prevent or minimize the oil spillage bar recovery. An expert in ship architecture is not required in every instance of a claim that a shipowner has failed to equip a vessel with adequate safety devices to prevent mishaps.[17] And while both the Supreme Court and the Court of Appeals for the Second Circuit have spoken in terms of the availability of "feasible" safety devices,[18] these cases

12. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 93–94, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). See, e. g., The H. A. Scandrett, 87 F.2d 708, 711 (2d Cir. 1937).

13. Pinto v. States Marine Corp., 296 F. 2d 1 (2d Cir. 1961), cert. denied, 369 U.S. 843, 82 S.Ct. 874, 7 L.Ed.2d 847 (1962); Lester v. United States, 234 F.2d 625, 628 (2d Cir.), cert. granted, 352 U.S. 889, 77 S.Ct. 130 (1956), dismissed per stipulation, 352 U.S. 983, 77 S.Ct. 384 (1957).

14. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926 (1960).

15. Ross v. Steamship Zeeland, 240 F.2d 820, 822 (4th Cir. 1957); Lester v. United States, 234 F.2d 625, 628 (2d Cir.), cert. granted, 352 U.S. 889, 77 S. Ct. 130 (1956), dismissed per stipulation, 352 U.S. 983, 77 S.Ct. 384 (1957). See Pinto v. States Marine Corp., 296 F.2d 1, 4 (2d Cir. 1961), cert. denied, 369 U.S. 843, 82 S.Ct. 874 (1962); Poignant v. United States, 225 F.2d 595 (2d Cir. 1955).

16. See Salem v. United States Lines Co., 370 U.S. 31, 37 n. 6, 82 S.Ct. 1119, 8 L. Ed.2d 313 (1962); June T., Inc. v. King, 290 F.2d 404 (5th Cir. 1961); Poignant v. United States, 225 F.2d 595, 598 n. 1 (majority opinion), 600–602 (Frank, J., concurring) (2d Cir. 1955); The T. J. Hooper, 60 F.2d 737, 740 (2d Cir.), cert. denied sub nom., Eastern Transp. Co. v. Northern Barge Corp., 287 U.S. 662, 53 S. Ct. 20, 77 L.Ed. 571 (1932). Cf. Wabash Ry. Co. v. McDaniels, 107 U.S. 454, 460–461, 2 S.Ct. 932, 27 L.Ed. 605 (1882); Pure Oil Co. v. Snipes, 293 F.2d 60, 71 (5th Cir. 1961); Troupe v. Chicago, D. & G. Bay Transit Co., 234 F.2d 253, 260 (2d Cir. 1956); Kennair v. Mississippi Shipping Co., 197 F.2d 605 (2d Cir. 1952).

17. Salem v. United States Lines Co., 370 U.S. 31, 82 S.Ct. 1119 (1962). But see Fatovic v. Nederlandsch-Ameridaansche Stoomvaart Maatschappij, 275 F.2d 188 (2d Cir. 1960); Martin v. United Fruit Co., 272 F.2d 347 (2d Cir. 1959).

18. Salem v. United States Lines Co., 370 U.S. 31, 82 S.Ct. 1119 (1962); Salem v. United States Lines Co., 293 F.2d 121, 123 (majority opinion), 126 (dissenting opinion) (2d Cir. 1961), rev'd, 370 U.S. 31, 82 S.Ct. 1119 (1962); Fatovic v. Nederlandsch-Ameridaansche Stoomvaart Maatschappij, 275 F.2d 188, 190 (2d Cir. 1960). See Pinto v. States Marine Corp., 296 F.2d 1, 6 (2d Cir. 1961), cert. de-

provide no authority for insulating the shipowner from liability when innovations in converting or modernizing a vessel, however timesaving and efficient they may prove to be, at the same time increase the dangers to men working thereon. An owner cannot, as an incident of improving his vessel, launch an instrumentality of hazard and escape liability for unseaworthiness on the plea that he is unable to eliminate a by-product of his creation and urge that the worker has failed to demonstrate that there is a feasible means to do so.[19] The shipowner has the undoubted right to experiment with his vessel, to modernize her and to improve her efficiency, but when he does so he is not exonerated from his absolute duty to supply a seaworthy vessel; he must either provide adequate devices to make and keep the working areas reasonably safe or accept the financial consequences of injuries to men resulting from any uncorrected hazardous condition. As the Supreme Court expressed it in the landmark case of Seas Shipping Co. v. Sieracki, in an analogous reference to the duty owing to all engaged in traditional ship's work, "[the shipowner] is at liberty to conduct his business by securing the advantages of specialization in labor and skill brought about by modern divisions of labor. He is not at liberty by doing this to discard his traditional responsibilities."[20]

Thus we reach the final question whether, upon all the evidence, it has been established that the vessel failed to measure up to the required standard. The Court had before it the trial testimony, various photographs of the vessel, other exhibits and also inspected the vessel.

The Court finds that the proximate cause of the libelant's fall was the presence of oil and grease approximately two feet in diameter; that oil and grease had dripped down from the gantry crane and other machinery above the aft end of the No. 7 hatch and accumulated during the operation of the crane from morning until libelant met with his accident at 4:20 P. M.; that its continued presence constituted an unseaworthy condition. Respondent's own witness testified that when oil spillage created a hazardous condition, it was the duty of officers to cause its removal either by placing sawdust or a chemical absorbent material thereon, but there is no proof that even this was done. The vessel on this ground alone is liable in rem.

The evidence sustains a further finding that at the time of the accident the vessel was also unseaworthy because it lacked adequate devices or appurtenances to minimize or arrest the drippings from various parts of the gantry crane during the course of operations. The absence of such safeguards rendered the vessel not reasonably fit to permit libelant to perform his task with reasonable safety and she is liable in rem.

Finally, the evidence also warrants a finding that Coastal, the owner, turned over the vessel to Sea-Land in an unseaworthy condition in that it then lacked adequate devices to minimize or reduce the spillage of oil. The gantries leaked oil while the vessel was being converted and before she was turned over to Sea-Land. In an effort to correct this condition, as already noted, drip pans were installed. The defense witness testi-

nied, 369 U.S. 843, 82 S.Ct. 874 (1962); Poignant v. United States, 225 F.2d 595, 602 (2d Cir. 1955) (Frank, J. concurring).

19. Moreover, while the libelant offered no expert testimony, the respondents have failed satisfactorily to establish that there

was no means reasonably available to correct or reduce the hazardous conditions. See Poignant v. United States, 225 F.2d 595, 602 (2d Cir. 1955) (Frank, J., concurring).

20. 328 U.S. 85, 100, 66 S.Ct. 872, 880 (1946).

fied that after the vessel had been turned over to Sea-Land they were removed because they created a "greater hazard" since they overflowed when it rained and the oil drippings spilled on the deck and other working areas with the ship's motion. Thus there was a failure to supply proper appurtenances at the time of the delivery of the vessel to Sea-Land under the demise charter and Coastal is held liable in personam.

The libelant suffered a compound fracture and dislocation of the distal joint, right thumb; contusion and abrasion of left shoulder; and contusions of the left chest wall with partial collapse and inflammation of the left lung. According to medical evidence, as of September 8, 1958 there was full restoration of lung function. His medical and hospital expenses totalled $1,140.96. Libelant was disabled from pursuing his usual occupation by reason of his injuries for a period of ten weeks, during which the loss of wages amounted to approximately $1,500. Thus the special damages totalled $2,640. In addition thereto, the Court awards for the nature of the injuries sustained by libelant and for pain to the present and future the sum of $10,000, making a total of $12,640. However, this sum is reduced by fifty per cent to $6,320 by reason of libelant's contributory negligence. He was working in the area for some time before he met with his accident and was aware or in the exercise of reasonable care should have been aware of the oily condition in the area where he stood to assist in pulling up the clamp.[21]

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

Submit decree in accordance therewith.

21. Cf. Guerrini v. United States, 167 F.2d 352, 356 (2d Cir.), cert. denied, 335 U.S. 843, 69 S.Ct. 65, 93 L.Ed. 393 (1948).