Paul TESTA, Libelant,

v.

MOORE–McCORMACK LINES, INC., Respondent and Impleading Petitioner,

v.

JOHN W. McGRATH CORPORATION, Respondent Impleaded.

United States District Court
S. D. New York.

Jan. 27, 1964.

Burlingham, Underwood, Barron, Wright & White, New York City, William M. Kimball, New York City, of counsel, for respondent and impleading petitioner.

Joseph F. McGoldrick, New York City, Martin J. McHugh, New York City, of counsel, for respondent impleaded.

WYATT, District Judge.

In this cause, eventually by agreement tried to the Court as a suit in admiralty, the decree will be for respondents.

The cause was commenced on October 25, 1960, against Moore-McCormack Lines, Inc., as sole defendant on the "law side" of the Court as a civil action and still bears an index number as such.

Plaintiff alleged that he was a citizen of New York and that defendant was a Delaware corporation. Jurisdiction was claimed under 28 U.S.C. §§ 1332 and 1333.

His action is for personal injuries sustained while working as a longshoreman on defendant's vessel moored at a pier in Brooklyn. It is claimed that the vessel was unseaworthy and that defendant was negligent.

Since the amendment and addition to Section 1332 effective July 25, 1958 a corporation has a dual citizenship—of the state of its incorporation and of the state of its "principal place of business".

Where diversity jurisdiction involves the citizenship of a corporation, it is now necessary to allege both the state of incorporation and of the principal place of business of a corporation, or at least that the principal place of business is in a state other than that of which a plaintiff is a citizen. See Fed.R.Civ.P. Official Form 2(a) and note thereto; 2 Moore's Federal Practice (2d ed.) 1956–58.

The complaint here is thus plainly defective so far as it attempts to plead diversity jurisdiction, since it fails to allege in what state is the "principal place of business" of defendant.

Absent diversity jurisdiction, it appears settled that there would be no jurisdiction of this cause as a civil action on the law side. Romero v. International

Diego R. Camarda, Brooklyn, N. Y., for libelant.

Term. Co., 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959); cf. Khedivial Line, SAE v. Seafarers' Int'l Union, 278 F.2d 49 (2d Cir.1960).

By the time of the pretrial conference, defendant shipowner by order had brought in John W. McGrath Corporation, the independent contractor stevedore and employer of plaintiff, as a third party defendant. Fed.R.Civ.P. 14(a).

Possibly in light of the jurisdictional difficulties mentioned, the parties agreed in the pretrial order that the cause should be transferred "to the Admiralty side of the Court" and "tried in Admiralty without a jury". In this state of affairs, the Court's jurisdiction seems clear. 28 U.S.C. § 1333(1). (Hereafter in this opinion, the admiralty terms for the parties will be used and the caption has been changed accordingly.)

Libelant Testa has been a longshoreman in New York harbor for about fifteen years.

The gang of which Testa was a member assembled at the 23rd Street (Brooklyn) pier of respondent shipowner a little before eight in the morning of Monday, September 12, 1960; they had been told by the stevedore boss at the close of the work day on Friday, September 9, to report there.

It was stipulated by the parties that during the weekend of September 10–11, 1960 there was notice by newspaper, radio and television that Hurricane Donna was expected to reach the New York Metropolitan area on Monday, September 12.

On that Monday morning, Testa travelled by auto from his home in Massapequa to the pier. At about 8 o'clock and on orders from the stevedore foreman, Testa and his gang (along with other gangs) went on to the vessel "Mormacmail" to unload her; the vessel was berthed at the pier with her port side along the south side of the pier (so that the starboard side would be the offshore side).

That Monday morning, the weather was very bad; it was Hurricane Donna, classed by the Weather Bureau as the worst Atlantic coast storm on record. The Weather Bureau records show that the rain and wind were for the morning hours indicated, as follows:

| Hour | Wind mph | Rain inches |
|---|---|---|
| 5 | 17 | .10 |
| 6 | 10 | .11 |
| 7 | 10 | .01 |
| 8 | 14 | .23 |
| 9 | 23 | .70 |
| 10 | 25 | .65 |
| 11 | 26 | .70 |
| 12 | 28 | .40 |

It had been raining from midnight to 5 a. m. During the whole of September 12 it rained 4.63 inches and the wind was from 10 to 56 miles per hour.

When Testa and his gang went aboard, they were assigned to discharge cargo (general) from the No. 2 hold; it was raining. The first order on deck from the stevedore foreman was to put up tents; Testa and his gang put up a wigwam shaped tent (the gear belonging to the stevedore) over the No. 2 hold. The No. 2 hatch was covered over with steel pontoons on top of which were tarpaulins. These were removed, and Testa and others then went down into the hold and began unloading cargo. After they had been working about an hour and a half, orders were received from the stevedore foreman for the men to come up from the hold and cover the hatches. Testa and his gang did cover the No. 2 hatch. Testa, Inserra and Esposito were working during this operation on the offshore (starboard) side of the No. 2 hatch, Testa working near the forward corner of this hatch. It was fifteen or sixteen feet from the starboard hatch coming to the starboard rail of the ship. Although the tent was up, rain was of course driven under it by the wind so that the deck area around the hatch coaming was entirely wet. The No. 2 forward winch was used in replacing the steel pontoon hatch covers. In replacing the tarpaulins Testa went up on top of the pontoon hatch covers to assist in the work. When the

tarpaulins had been secured, Testa says that in order to leave the ship he walked along the hatch cover toward the offshore hatch coaming generally forward at an angle, that he stepped down to the deck, that as he did so his foot slipped and he fell forward and around, that his left arm first hit the deck and that his left shoulder then hit the stanchion supporting the No. 2 forward winch, that he saw grease underneath his foot and that the left side of his jacket was full of grease, that he then saw a trail of grease running from the winch about 6 to 8 feet in an offshore direction and that this grease trail was of varying widths, generally 4 to 6 inches wide. (The suggestion for libelant is that this grease had been used on the steel cable for the winch drum.)

Inserra helped Testa up and off the ship. Testa reported his hurt promptly to Hickey, the stevedore's first aid man on the pier who gave no treatment. Hickey's records show this was at ten in the morning of September 12. That day his shoulder and arm were hurting and although he checked in and tried to work the next day, Testa felt his hurt to such an extent that he stopped and went again to see Hickey, who this time sent him to a physician. He received treatments from this physician and resumed work on October 10, thus being away from work in the period September 12—October 10. Testa says that on account of his injury he missed 3 or 4 days from work in each of the 6 to 8 months after October 10.

The fall did not cause any fracture but there were contusions, some swelling, tenderness, pain and some limitation of motion. Testa says that on rainy days his left shoulder, arm and elbow still hurt. It appears that he had previously hurt the same left shoulder, arm and elbow in a fall.

The suit is based on claimed unseaworthiness of the vessel, negligence, and failure to provide a safe place to work.

The essence of the case for libelant is that there was grease on the deck and that the presence of such grease made the ship unseaworthy.

Undoubtedly Testa fell and undoubtedly the deck was very wet but I am not persuaded by a fair preponderance of the evidence that there was any grease on the deck. Among other reasons for this conclusion are these. No one saw any grease before the fall and it is hard to believe that an area of grease of the size claimed by libelant could so suddenly appear, especially since the grease was described by libelant at one point as "heavy sticky". The records of Hickey would indicate that libelant said nothing about any grease when he first reported his injury; Hickey's notation is: "slipped on wet deck", but if there had been grease it would have been only natural for libelant so to report and Hickey so to record. Inserra, who was close by in the same area when Testa fell, signed a statement about the fall on February 1, 1961; the statement was written out by an investigator for respondent at an interview with Inserra on that date. The statement covers two and a half memoranda pages ($12\frac{1}{2}$ x 8 inches) and there is no mention of grease. Esposito testified that he did not notice any grease on the deck "that morning"; his testimony is thus broad enough in this respect to cover the period *after* the fall as well as before.

Even if it were the fact that there was grease on the deck where libelant fell, I would not find the vessel unseaworthy on that account.

■ The test to determine unseaworthiness which should be applied to a transitory condition is the same as that where the condition is more permanent; it is not the test of common law negligence but rather that laid down in Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960): "a vessel and appurtenances reasonably fit for their intended use". See also Castro v. Moore-McCormack Lines, Inc., 325 F.2d 72 (2d Cir.1963) where the finding of the trial judge that there was no unseaworthiness was upheld on appeal.

■ But under the Mitchell test the mere presence of grease does not *ipso facto* make the vessel unseaworthy.

Referring to the Mitchell decision, our Court of Appeals has said (Pinto v. States Marine, etc., 296 F.2d 1, 5, 6; 2d Cir. 1961; emphasis supplied):

"Most jurors would see a difference in the seaworthy condition of a vessel whose rails had been left coated with slime and gurry *for hours,* and of another generally spick-and-span, on which a mishap had *suddenly* created a slippery condition. Must they be told that this distinction, relevant in common sense, is irrelevant in law? So here, assuming the engine room steps were *so constructed as to keep the hazard of oil accumulation to a minimum,* most jurors would see a difference in seaworthiness as between a vessel whose well-constructed steps bore the oil accumulation of *days* and another whose similar steps had only a film of oil unavoidably accumulated since a cleaning *a few hours* before. We read Mitchell as saying they may nevertheless hold the owner liable in the latter case, not that they must.

\* \* \* \* \* \*

"The Court's decision that it was inconsequential, as a matter of law, that the dangerous condition did not arise until a moment after the sailing did not logically carry with it a conclusion that it was similarly inconsequential, as a matter of fact, that the condition arose only a moment before the accident; whether such a momentary condition would or *would not* render the vessel unseaworthy would be for the trier of the facts to say."

In Blier v. U. S. Lines Co., 286 F.2d 920, 924 (2d Cir.1961) a charge to the jury was found "wholly unexceptionable" which contained his instruction:

"In considering whether the vessel was unseaworthy due to the presence of grease on the steps of the gangway, the following rules should be followed:

" 'A vessel is not unseaworthy by reason of a temporary condition, if even so the vessel was reasonably safe and suitable. In order to be seaworthy, a vessel need not meet a standard of perfection. It need only be reasonably safe for the purpose to which it is to be put.' "

The plaintiff and two other witnesses who were working in the area where he fell are all agreed that they did not see any grease on the deck at any time *before* he fell. Assuming that grease was there at his fall, it could have been there for only a very short time.

■ Under all the circumstances, including the presence of grease only a very short time before the accident, the size of the deck area in question with alternative grease-free places to walk, the stationary position of the vessel at a pier, etc., the vessel does not appear to me to have been unseaworthy.

Even if the ship were unseaworthy from the presence of grease, it seems tolerably clear that the fall was proximately caused by the negligence of libelant in jumping from the hatch cover to a wet deck rather than from the unseaworthy condition. From the hatch cover (where Testa was) to the deck is about three feet. The wind was blowing hard, it was raining and the deck was very wet. Testa evidently jumped on to the wet deck, instead of getting down more slowly, as for example by sitting on the edge of the hatch cover and then easing himself down. His testimony, while not free from conflicts in this respect, would indicate that he went in one step from the hatch cover to the deck. Inserra testified that he saw Testa "hop off" the hatch cover. To jump or "hop" a distance of some three feet to a wet deck in a high wind does not seem to me to meet the standard of care of the ordinary prudent man.

For the same reasons as above plus a failure to show any knowledge, actual or constructive, of the condition by the shipowner, there can be no finding of negligence.

The suggestion is that it was negligent for the shipowner to permit the longshoremen to work under hurricane conditions. This suggestion cannot be taken seriously because (a) libelant worked at the orders of his employer, the stevedore, and not the shipowner and (b) libelant was in no way coerced into working that day but came in voluntarily and with full knowledge of the weather conditions. Moreover, there is nothing to show that the longshoremen, with care for themselves appropriate to the circumstances, could not have worked safely. The stoppage of work was not because it was unsafe but because the rain was beginning to damage the cargo.

During the trial and over objection for libelant, questions were permitted to be answered dealing with another action brought by libelant in this Court: whether in this other action he claimed to have slipped on grease, whether this was near a No. 2 hatch, whether he had been treated by Dr. Feinberg on that occasion, etc. Decision was reserved on a motion for libelant to strike this testimony.

After reflection, I feel that the ruling was probably in error; the motion to strike this evidence is therefore granted, and in making findings herein the evidence has been disregarded.

There is very little authority on the point. The annotation at 69 A.L.R.2d 593 seems on the whole to indicate that the evidence should not be admitted; so also does Munter v. R. H. Macy & Co. Inc., 106 N.Y.S.2d 789 (Sup.App.Term, N.Y.Co.1951). For admitting such evidence is Mintz v. Premier Cab Ass'n, Inc., 75 U.S.App.D.C. 389, 127 F.2d 744 (1942). In this instance, it seems particularly unfair to let the evidence stand because (a) there was nothing to show that libelant had not in fact slipped on grease on the other occasion and (b) there was only one other occasion so that no suggestion of a series of claims is possible.

The foregoing contains the findings of fact and conclusions of law required by Admiralty Rule 46½.

There must be a decree for respondent shipowner, which at the same time will dispose of the claim made against the respondent impleaded.

Settle decree on notice.