Alfred J. LIND, Appellant,

v.

AMERICAN TRADING & PRODUCTION CORPORATION, Claimant of THE Steamship VIRGINIA TRADER, her boilers, engine, tackle, apparel and furniture, Appellee.

No. 16602.

United States Court of Appeals Ninth Circuit.

Sept. 8, 1961.

Kane & Spellman and John D. Spellman, Seattle, Wash., for appellant.

Bogle, Bogle & Gates and Robert V. Holland, Seattle, Wash., for appellee.

Before STEPHENS and HAMLEY, Circuit Judges, and EAST, District Judge.

EAST, District Judge.

## Parties

The libelant Alfred J. Lind (Lind), aged 23 years, with about "seven years, on and off" experience as a seaman, on January 13, 1958, signed regular shipping articles on the S.S. Virginia Trader (Vessel) at the Port of Vancouver, Washington, as an ordinary seaman for a foreign voyage to India, with way ports and return. American Trading & Production Corporation is the claimant of the Vessel following her libel and attachment within the District of Western Washington on October 4, 1958.

## Jurisdiction

Lind brought this action in admiralty under the Jones Act, Title 46 U.S.C.A. § 688, based upon alleged negligence on the part of the master of Vessel, acting through the boatswain, and alleged unseaworthiness of the vessel proximately resulting to his alleged personal injury.

The District Judge entered a judgment adverse to Lind upon his contentions of liability,[1] from which Lind appeals, and this Court has jurisdiction pursuant to Title 28 U.S.C.A. § 1291.

## Statement of the Case

Shortly before noon of January 24, 1958, while the Vessel was under way on the high seas, about three days out of Honolulu, Hawaii, the boatswain directed Lind and three of his fellow crew members to relieve a prior watch and to continue the soogeeing[2] of the overhead and sides of the port midships shelter deck of Vessel. Lind and the other three members of the watch were supplied with a Turks head brush, approximately eight inches in diameter, with a handle of four or five feet in length; a bucket of soogee solution, consisting of a degreasing compound of soap mixed with water. The process of soogeeing is the application or brushing on of the soogee solution to the surface of the vessel to be cleaned and the washing off of the solution with fresh water. The footing in the area of where soogeeing was taking place was necessarily slippery from the soogee solution itself and the water used in washing down. There is testimony that seawater was also on the deck area. Lind and his fellow watch members had been engaged in this ship's duty approximately two hours when Lind slipped and fell against a shelf protruding from a bulkhead, causing him personal injury.

As stated above, the District Judge held adverse to Lind upon his claim of liability by reason of alleged negligence and unseaworthiness, and on this appeal Lind asserts five "specifications of error"

1. Lind had a second cause of action wherein he claimed "unearned wages from the time he left the Vessel until the end of the voyage in the amount of $866.61," for which the District Judge allowed judgment in Lind's favor.

2. "One activity the merchant seaman can count on as one of the most common duties aboard ship is that of washing down paintwork or 'soogeeing.' Soogee is generally a mixture of water and a strong soap powder * * *. Citing Merchant Ships, a Pictorial Study, issued by Cornell Maritime Press, Cambridge, Maryland, 1955, p. 7."

of which we deem it necessary to deal with only the following three:

"2. The District Court erred in sustaining the objection to the offer of proof concerning whether it was dangerous to soogee at the time and place libelant was injured.

"3. The District Court erred in finding, in finding of fact number VI, 'That there was nothing negligent or unseaworthy respecting the manner of doing the work involved at the time of libelant's accident nor in respect to the condition of the deck caused by the weather or the doing of the work itself,' which was clearly erroneous.

"4. The District Court erred in finding, in finding of fact number VII, "That the ship was not unseaworthy, and the surface of the deck became slippery from a mixture of soogeeing waste liquids and shipped sea water in the normal course of the normal work of the ship,' which was clearly erroneous." [3]

As was pointed out by Mr. Justice Frankfurter in his concurring opinion in Pope & Talbot, Inc. v. Hawn et al., 1953, 346 U.S. 406, 414, 74 S.Ct. 202, 207, 98 L.Ed. 143, it was

"Not until 1920, and then by Act of Congress, 46 U.S.C. § 688, * * * were seamen given the alternatives of suing for negligence or unseaworthiness. See Pacific S.S. Co. v. Peterson, 278 U.S. 130, 138 [49 S.Ct. 75, 77, 73 L.Ed. 220]." [4]

■ In considering specification of error No. 2, we find from the record that the testimony of a witness for Lind, one Elon H. Anderson, a seaman of some "20 years or better" experience, having sailed as ordinary seaman A.B., bos'n, deck maintenance, and holding an unlimited license, was given by way of deposition. Anderson was a member of Lind's watch and an eye witness as to the conditions and circumstances during the period of Lind's work at soogeeing and his fall.

Turning to Lind's "offer of proof concerning whether it was dangerous to soogee at the time and place libelant was injured," we find the following pertinent testimony:

(Deposition of Elon H. Anderson—direct):

"Q. I want to know if you can remember any complaints made by anyone other than yourself? A. Well, I guess we were complaining, all of us, you know, working there, because it was awful slick and you had to watch yourself.

"Q. Now, you said you 'guess' that. Do you remember anybody

---

3. In Lind's libel, he alleges that his "injuries were directly and proximately caused by defendant's [sic] careless and negligent failure to provide plaintiff [sic] a seaworthy vessel and a safe place to work, in the following respects (applicable to specification of error No. 4):

"1—Said vessel was unseaworthy in that its shelter deck was covered with a soapy and greasy solution, making it slippery and dangerous to stand on."

(applicable to specification of error No. 3):

"5—Defendant [sic] negligently required the plaintiff [sic] to engage unnecessarily in the inherently hazardous work of seuging [sic] and cleaning the vessel with a soapy solution while said vessel was at sea in a heavy swell."

4. "By section 33 of the Merchant Marine Act, as heretofore construed, the prior maritime law of the United States was modified by giving to seamen injured through negligence the rights given to railway employees by the Employers Liability Act of 1908 and its amendments, * * * and permitting these new substantive rights to be asserted and enforced in actions *in personam* against the employers in federal or state courts administering common-law remedies, with the right of trial by jury, or in suits in admiralty in courts administering maritime remedies, without trial by jury. Panama R.R. Co. v. Johnson, 264 U.S. 375 [44 S.Ct. 391, 68 L.Ed. 748]; Engel v. Davenport, 271 U.S. 33 [46 S.Ct. 410, 70 L.Ed. 813]; Panama R.R. v. Vasquez, 271 U.S. 557 [46 S.Ct. 596, 70 L.Ed. 1085]; Baltimore S.S. Co. v. Phillips, 274 U.S. 316 [47 S.Ct. 600, 71 L.Ed. 1069]." Pacific S.S. Co. v. Peterson, 278 U.S. 130, 134–135, 49 S.Ct. 75, 76, 73 L.Ed. 220.

making any complaints to anybody at that time? A. I don't remember, no. That is too long ago.

"Q. What, if anything, was done to the deck while you were working there?

\* \* \* \* \* \*

"A. She was taking water from outside and the water wouldn't run out through the scupper. And the water stayed and the oil slick stayed on the deck until we got the hole unplugged and the water out of part of it.

"Q. Now, can you describe the roll, if any, of the vessel while you were doing this soogeeing? A. Yes, I would say she was *rolling 10– 15 degrees back and forth.* [Italics supplied.] [5]

"Q. Who, if anyone, was supervising the work you were doing there? A. Just the Bos'n.

"Q. Can you tell me whether or not he was present from time to time while you were doing the work? A. Yes, he was there most of the time. He was working there with us, as far as I can remember. He was working with us.

\* \* \* \* \* \*

"Q. Do you have an opinion as to whether or not the existing sea condition made it dangerous to soogee at that time and place? A. Yes.

"Q. Then, what is your opinion?

"Mr. Holland: Then I renewed my objection as not being the fact of the—

"The Court: On what basis is libelant entitled to have this fellow worker give an opinion?

"Mr. Spellman: Well, Your Honor, on the basis that he is a man who has gone to sea for nineteen or twenty years, and has testified that he has soogeed on every vessel he has been on, I believe, and—

"The Court: I think the question should be an inquiry as to what was the condition, and a summarized question could be, 'What, if you know, was the slipping agent or was the particular thing that permitted the slipping or caused the slipping?'

"This objection is sustained."

In rejecting Anderson's advisory opinion, the District Judge was exercising his judicial discretion on the subject of expert advisory testimony.

"\* \* \* It is for the trial court in the exercise of a sound discretion, to determine whether expert testimony is appropriate under the particular circumstances of the case." Citing Duff v. Page, 9 Cir., 1957, 249 F.2d 137, 140.

We find no abuse of the District Judge's judicial discretion, and therefore Lind's specification of error No. 2 is without merit.

■ Going out of numerical order, we turn now to Lind's specification of error No. 4, and conclude that the performance of soogeeing by crew members in and of itself cannot render a vessel unseaworthy. It is a necessary, normal and recurring seaman's duty, and work that must be done on board and which is customarily done while the vessel is at sea,[6] causing the deck within the working area to become necessarily slippery, with footing thereon unsteady, and requiring the seaman to be alert as to his footing.

---

5. We are forced to assume that the District Judge, with his vast experience in matters maritime, took it to be a matter of common knowledge among seafaring men that if a merchantman loaded with a homogeneous cargo, such as grain, was under way at sea and "rolling 10–15 degrees back and forth," she was riding a moderate, to say the most, "swell."

6. (Capt. Adrian Raynaud, a man of some 40 years' experience in sailing, testified as follows):
"Q. (By Mr. Holland) Would you state whether or not there is any custom as to the conditions under which the men work while doing soogeeing in the course of a voyage and with particular reference to the footing underneath where they are walking? A. Yes. It's generally slippery from the spilling of the soogee itself

Therefore, the District Judge's finding of fact No. VII, complained of in Lind's specification of error No. 4, is not clearly erroneous.[7]

In dealing with specification of error No. 3, it is well to recall Lind's full allegation of negligence:

> "5—Defendant [sic] negligently required the plaintiff [sic] to engage unnecessarily in the inherently hazardous work of seuging [sic] and cleaning the vessel with a soapy solution while said vessel was at sea in a heavy swell."

We find in this allegation what Gilmore & Black in their work "The Law of Admiralty," at p. 320, referred to as the "almost theoretical" construct:

> "The only case which is today clearly outside the scope of the unseaworthiness doctrine is the almost theoretical construct of an injury whose only cause is an order improvidently given by a concededly competent officer on a ship admitted to be in all respects seaworthy.[221]"

---

"221 * * * With more reason, so far as the facts were concerned, the Sixth Circuit in Imperial Oil, Ltd. v. Drlik, 234 F.2d 4, 1956

---

and the washing of it off on the deck, and consequently a man has to be alert at all times to watch his footing.

"Q. What have you observed to be the custom, if any, with reference to whether that work is done in port, at sea, or one or the other, or both? A. Generally it's done at sea. One of the first tasks put on the crew when leaving port. It is occasionally done in port, but not very often." R. Vol. II 105.

"* * * Q. (By Mr. Holland) Will you state whether or not there is any custom, Captain, as to whether or not that work is done at sea when the sea is calm, or whether it is done when the vessel is rolling or both? Just yes or no, is there a custom? A. There is a custom.

"Q. Would you state what that custom is? A. The custom is, the primary job immediately leaving the port is to wash the ship down, and that goes on whether or not the weather is fine or stormy. As a general rule it's better to do it when

A.M.C. 1862 (6th Cir. 1956) concluded that plaintiff's injury had been caused by negligence alone: ' * * * there was no evidence that the vessel or any part of her equipment was defective. The accident arose out of the negligent use of seaworthy equipment. The obligation of the vessel owner to provide seaworthy appliances has not been extended to require the owner to keep those appliances from being used in a negligent manner. If so used, liability rests upon negligence rather than upon unseaworthiness.' "[8]

In short, we observe that Lind claims negligence on the part of the master because the boatswain "improvidently" ordered him to engage in soogeeing the Vessel *while said vessel was at sea in a heavy swell."* [Italics supplied.] As to the condition of the sea and waves and the roll of the Vessel, witness Anderson deposed that "she was rolling 10–15 degress," supra. We comment that the Vessel's log is conspicuous by its absence from the record and the better and more competent evidence admonition is timely recalled.[9]

We inquire as to what are the necessary elements of maritime negligence.

it's wet and raining because then you wash off the grime and the filth a lot easier. Your soogee doesn't have the chance to dry on the paint work and become attached to it." R. Vol. II 106.

7. "Since that decision (McAllister) [v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20] this court has uniformly regarded determinations as to negligence made in admiralty cases as findings of fact which are not to be overturned unless clearly erroneous." Citing Pacific Tow Boat v. States Marine Corp., 9 Cir., 1960, 276 F.2d 745, 752.

8. Justice Frankfurter, concurring in Pope & Talbot v. Hawn, supra, remarked that "* * * it will be rare that the circumstances of an injury will constitute negligence but not unseaworthiness."

9. Title 46 U.S.C.A. § 201:
"Every vessel making voyages from a port in the United States to any foreign port, or, being of the burden of seventy-five tons or upward, from a port on the

Gilmore & Black, supra, pp. 310–11, says:

" \* \* \* the shipowner's duty may be higher than that of a shore employer and the quantum of negligence needed to establish his liability less. Once again Justice Cardozo in the Cortes case [Cortes v. Baltimore Insular Line, 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368] expressed this necessarily vague concept on the broad level of doctrine:

" 'We do not read the act for the relief of seamen [i.e. the Jones Act] as expressing the will of Congress that only the same defaults imposing liability upon carriers by rail shall impose liability upon carriers by water. The conditions at sea differ widely from those on land, and the diversity of conditions breeds diversity of duties. This court has said that "the ancient characterization of seamen as 'wards of admiralty' is even more accurate now than it was formerly." \* \* \* Out of this relation of dependence and submission there emerges for the stronger party a corresponding standard or obligation of fostering protection \* \* \*.

" 'The act for the protection of railroad employees does not define negligence. It leaves that definition to be filled in by the general rules of law applicable to the conditions in which a casualty occurs. [Citing cases.] Congress did not mean that the standards of legal duty must be the same by land and at sea. Congress meant no more than this, that the duty must be legal, i.e. imposed by law; that it shall have been imposed for the benefit of the seaman, and for the promotion of his health and safety; and that the negligent omission to fulfill it shall have resulted in damage to his person.

When this concurrence of duty, of negligence and of personal injury is made out, the seaman's remedy is to be the same as if a like duty had been imposed by law upon carriers by rail.'

\* \* \* \* \* \*

"The Jones Act plaintiff bears the burden of going forward with evidence on the essential elements of a negligence action: the existence of a duty; the negligent violation of the duty by defendant; and the causal relationship of violation to injury."

■■■ We add that the Jones Act libelant, under an allegation of negligence, also has a rule of evidence in his favor—the doctrine of *res ipsa loquitur*. In Johnson v. United States, 333 U.S. 46, 68 S.Ct. 391, 393, 92 L.Ed. 468, an action in admiralty tried without a jury, arising in this Circuit, Justice Douglas said:

" 'The rule of *res ipsa loquitur* \* \* \* means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference.'

\* \* \* \* \* \*

"No act need be explicable only in terms of negligence in order for the rule of *res ipsa loquitur* to be invoked. The rule deals only with permissible inferences from unexplained events."

The District Judge heard Lind's testimony in open court and had the opportunity to evaluate the witness' intelligence, motive and state of mind and view his demeanor and manner while on the stand, a privilege we are denied from a perusal of the cold record. But we do comment that Lind's testimony:

"Q. Mr. Lind, would you describe the condition of the sea while you were working there on the port

Atlantic to a port on the Pacific, or vice versa, shall have an official log book; and every master of such vessel shall make, or cause to be made therein, entries of the following matters, that is to say:
\* \* \* \* \* \* \* \*

"Fifth. Every case of illness or injury happening to any member of the crew, with the nature thereof, and the medical treatment."

side shelter deck? A. Well, it was rough, blowing a strong gale, as they say, you know.

"Q. Now, what effect did this condition of the sea have on the vessel? A. It was rolling quite a bit.

\* \* \* \* \* \*

"Q. Do you have any idea how much this vessel was rolling? A. No, I couldn't say right offhand, you know, I mean one way or the other, but it was rolling quite heavy.

"Q. Would you call it a light or a heavy roll?

"The Court: He said it was rolling quite heavily."

does not find corroboration in witness Anderson's direct statement of a "10–15 degree roll." While the District Judge in his challenged findings of fact does not find that the doctrine of *res ipsa loquitur* does not apply in this case, we do

" \* \* \* think the [district] Court simply found that not only by the direct testimony but the circumstantial evidence with all the dignity given it by *res ipsa loquitur* as well, were insufficient to establish negligence on the part of the \* \* "

master through the boatswain. Gillen v. United States, 9 Cir., 1960, 281 F.2d 425, 429.

The appellee argues in its brief that in spite of the testimony of appellant himself and Anderson to the effect that the deck was in such slippery condition that you "couldn't walk on it" and that it was "nearly impossible to try to stand," the undisputed fact that Lind and his watch worked approximately two hours following the previous four-hour watch of soogeeing, is indicative of normal working conditions at the time.

In conclusion, we cannot say that the District Judge was "clearly erroneous" in his finding of fact No. VI, as complained of by Lind in his specification of error No. 3.

The District Judge's judgment is affirmed.