Harvey WILLIAMS, Libelant,

v.

ARROW STEAMSHIP CORPORATION, etc., Respondent and Impleading Petitioner,

v.

ATLANTIC AND GULF GRAIN STEVE-DORING ASSOCIATES, Impleaded Respondent.

No. 8259.

United States District Court
E. D. Virginia,
Norfolk Division.

July 1, 1963.

Jerrold G. Weinberg, Norfolk, Va., for libelant.

Robert M. Hughes, III, Seawell, McCoy, Winston & Dalton, Norfolk, Va., for respondent and impleading petitioner.

William B. Eley, Rixey & Rixey, Norfolk, Va., for impleaded respondent.

WALTER E. HOFFMAN, Chief Judge.

The single issue in this case is whether a vessel is rendered unseaworthy by the presence of grain or grain dust on the vessel's deck, where such grain or grain dust was an inevitable and unavoidable instance of the loading operation. While a charge of negligence was also made in the libel, there is no merit to this contention.

The M/V CONTINENTAL CARRIER docked at the Continental Grain

elevator on November 18, 1961, to load a cargo of No. 2 yellow corn for Europe. Atlantic and Gulf Grain Stevedoring Associates contracted to carry out the loading operations. Libelant, a longshoreman employed by Atlantic and Gulf, was on deck during the grain loading process and received an order to "slack pipe off" which required him to loosen a rope approximately ten feet distant from where libelant was situated. He started toward the rope "in a little bit of hurry" but stepped on loose grain scattered about the deck thereby causing him to fall. His shoulder hit the steel deck resulting in a severe contusion ultimately diagnosed as adhesive capsulitis of the right shoulder joint from trauma. While there is no evidence of permanent disability, there remained limited abduction at the time of trial, approximately seventeen months following the injury. For reasons hereinafter stated the details of libelant's injuries, loss of wages, medical expense, etc., will be eliminated.

All witnesses agree that the loading operation was entirely normal and customary. The vessel lists if one side accumulates more grain than the other. To keep the grain from overflowing on deck it was necessary to "slack off" the offshore line which regulated the movement of the grain chute and this was what libelant was about to do when he slipped and fell. The grain comes from the elevator through a hopper into the hold of the ship. It is impossible to put the chute down all the way into the hopper as samples must be drawn by the state authorities about every five minutes through the use of a "pelican" which is a long pole with a scoop on the end. These samples must be drawn during the loading process.

Grain will get on the deck during loading in several ways; (1) while topping off the hatch, (2) bouncing out of the hopper, (3) coming out of the chute when it is moved from the top of the hopper, and (4) if the chute leaks. There is no evidence of a defective or inadequate chute. The chute is about 16 to 18 inches in length leading into the hopper.

All witnesses agree that grain cannot be loaded into the hold of a vessel without some of the particles or dust getting upon the deck. They agree that there was no more grain on the deck than was normal or customary during any loading operation. They agree that the kernels of corn will inevitably create a slippery condition of the deck. They attempt to keep the deck "shovel clean" but even this procedure will not remove all of the grain. The longshoremen are provided with rubber sole shoes as a safety measure. In short, we have for consideration an unavoidable condition created by reason of the ship being used in a normal manner. It was "as fit for service as similar vessels in similar service." Poignant v. United States, 2 Cir., 225 F.2d 595, 598, cited with approval by Mr. Justice Stewart, the author of the majority opinion, in Mitchell v. Trawler Racer, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed. 2d 941.

The officers of the vessel received no report of the accident. The stevedores always clean the vessel's deck prior to departure.

There is some suggestion that the deck was newly painted and "rather slippery" even without the presence of any kernels of corn. One witness stated that he had slipped from "new paint" but later said, "I suppose, I don't know," when questioned as to the cause of his slipping. However, it is conceded that, even if the deck had been freshly painted, it was dry and one witness stated that the paint was no more slippery than on any other deck. The record does not disclose when the deck was painted prior to the accident, and there is no suggestion that any coating was inadequate or applied improperly. The libelant does not contend that he slipped by reason of the paint on deck; he affirmatively stated that he stepped on grain, thus causing him to fall. We find no evidence of negligence.

Mindful of the tendency to impose liability upon the shipowner when an accident occurs aboard ship, we approach the issue of unseaworthiness.

Such a condition is usually a question of fact. Mahnich v. Southern S. S. Co., 321 U.S. 96, 97, 99, 64 S.Ct. 455, 88 L.Ed. 561. Unseaworthiness sets in train awesome obligations which distinguish it from negligence. Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 81 S.Ct. 6, 5 L.Ed.2d 20. There has been a complete divorcement of unseaworthiness liability from concepts of negligence. Mitchell v. Trawler Racer, supra. Transitory unseaworthiness no longer exonerates the shipowner but, as Mr. Justice Stewart said in Mitchell (362 U.S. 550, 80 S.Ct. 933):

> "What has been said is not to suggest that the owner is obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service. Boudoin v. Lykes Bros. S. S. Co., 348 U.S. 336 [75 S. Ct. 382, 99 L.Ed. 354]."

In Mitchell the case was reversed and remanded for a trial on the issue of unseaworthiness. Mitchell does not say that the mere presence of slime and fish gurry on the rail constituted unseaworthiness. Only in the dissenting opinion of Mr. Justice Frankfurter are we able to conclude that Mitchell has established an unqualified absolute duty or warranty when the injury occurs through the momentary inadequacy of a prudently operated vessel. But the majority opinion uses the phrase, "The standard is not perfection, but reasonable fitness," indicating that, while the duty is absolute, seaworthiness still involves a determination of whether the particular alleged condition or operation rendered the vessel "reasonably fit for [her] intended use."

The teachings of Mitchell do not point to any theory of absolute liability for shipboard accidents. In Blier v. United States Lines Co., 2 Cir., 286 F.2d 920, cert. den. 368 U.S. 836, 82 S.Ct. 32, 7 L.Ed.2d 37, a seaman was boarding a vessel when he slipped on a grease smear on one of the steps leading from the top of the bulwarks of the vessel to the main deck. Urging the authority of Mitchell, plaintiff complained of an erroneous instruction to the jury reading, in part, as follows: (286 F.2d 924):

> "The owner of a vessel has an absolute duty to provide a seaworthy vessel. This means that the defendant was obligated to furnish and maintain safe working conditions. Seaworthiness is reasonable fitness for the particular voyage, or [as] directed to the present case, reasonable fitness for the particular uses which the plaintiff was making of the ship at the time of his alleged injury.

> "In considering whether the vessel was unseaworthy due to the presence of grease on the steps of the gangway, the following rules should be followed:

> "A vessel is not unseaworthy by reason of a temporary condition, if even so the vessel was reasonably safe and suitable. In order to be seaworthy, a vessel need not meet a standard of perfection. It need only be reasonably safe for the purpose to which it is to be put."

Subsequent to Blier the Second Circuit again had occasion to point out that "a vessel does not become unseaworthy by reason of a temporary condition caused by a transient substance if even so the vessel was as fit for service as similar vessels in similar service." Pinto v. States Marine Corp., 2 Cir., 296 F.2d 1, cert. den. 369 U.S. 843, 82 S.Ct. 874, 7 L.Ed.2d 847. In construing the opinion in Mitchell, the Second Circuit in Pinto had this to say (296 F.2d 6):

> "So here, assuming the engine room steps were so constructed as to keep the hazard of oil accumulation to a minimum, most jurors would see a difference in seaworthiness as be-

tween a vessel whose well-constructed steps bore the oil accumulation of days and another whose similar steps had only a film of oil unavoidably accumulated since a cleaning a few hours before. We read Mitchell as saying they may nevertheless hold the owner liable in the latter case, not that they must. What Mitchell did forbid was the Court's instructing them to make any distinction based on whether the condition had or had not arisen until the voyage commenced, or on whether it had or had not been brought home to the owner."

■ From the foregoing authorities it seems clear that the presence of grain on the deck of a vessel is not, of itself, unseaworthiness in the eyes of the law. Its transitory presence alone is irrelevant.

There are, as may be expected in a confused field, authorities suggesting to the contrary. In Orlando v. Prudential Steamship Corp., S.D.N.Y., 214 F.Supp. 116, where a marine carpenter slipped on grain on the deck of a vessel, the district judge found as a fact (214 F.Supp. 119):

"11. The presence of grain on the deck on the SS San Angelo Victory at the time of the libelant's fall constituted an unseaworthy condition."

There was, in Orlando, no indication as to how the grain arrived on deck. We can only say that, in line with Pinto, the trier of fact had the prerogative to make such a finding, not that he was required to do so.

Libelant relies upon the celebrated case of Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143. The principal distinction is the absence of the hatch covers in Pope & Talbot. True, the injured party slipped on grain but it was the combination of circumstances which supported a finding of both unseaworthiness and negligence. We do not believe that the present controversy is analagous to Pope & Talbot.

Nor is there merit to libelant's claim in consideration of Johnson Line v. Maloney, 9 Cir., 243 F.2d 293. The longshoreman slipped on grain which had been loaded at a different port. In upholding a finding against the ship on either unseaworthiness or negligence, the Ninth Circuit stressed the failure to clean the deck following the grain loading at Tacoma and prior to its arrival at Seattle.

While the Fourth Circuit is in apparent disagreement with the Second Circuit on the utility of the factor of time in any determination of unseaworthiness [1], Grzbowski to Use of Traveler's Ins. Co. v. Arrow Barge Co., Inc., 4 Cir., 283 F.2d 481, the decision in the instant case is not dependent upon how long the kernels of corn had been on the deck. It is on the ground that the vessel was reasonably fit for its intended use or, stated more aptly, the fitness for service as similar vessels in similar service. Where the proper, customary and normal method is adopted in loading grain, and where it is impossible to prevent grain from spilling onto the deck during the loading operation, the mere presence of grain on the deck does not, standing alone, in the judgment of this trier of facts, constitute an unseaworthy condition even though a workman lawfully aboard the vessel and performing the traditional work of a seaman is injured by reason of slipping on the loose grain.

Proctors for the respondent will prepare a decree in accordance with this memorandum which is adopted by the Court in lieu of specific findings of fact and conclusions of law. Matters touching upon any differences between the impleading petitioner and impleaded respondent may be reserved.

I. See: "The Doctrine of Unseaworthiness in the Lower Federal Courts", 76 Harv. L.Rev. 819; Morales v. City of Galveston, 370 U.S. 165, 82 S.Ct. 1226, 8 L.Ed. 2d 412.