**George E. SCHELL, Libelant,**

v.

**The CHESAPEAKE AND OHIO RAILWAY COMPANY, Respondent.**

**No. 841.**

United States District Court
E. D. Virginia,
Newport News Division.

Feb. 22, 1967.

Stant, Moss, Rafal & Stokes, Edwin J. Rafal, Norfolk, Va., for libelant.

Baird, Crenshaw & Ware, Edward R. Baird, Norfolk, Va., for respondent.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

Schell, a machinist's helper in the marine mechanical department of The Chesapeake and Ohio Railway Company, was injured while working aboard the C. & O. tug GEORGE W. STEVENS on April 12, 1965, when he slipped on stairs. At the time in question the tug was docked at Finger Pier, Newport News, Virginia, in navigable waters. The tug arrived at the pier at 2:35 P.M. on April 9, 1965, and departed therefrom at 2:50 P.M. on April 13, 1965. The purpose of the docking was to permit the renewal of the worm gear and thrust rings of the tug's steering engine.

Schell alleges that he was caused to slip on the steps leading from the engine room to the stern engine because of grease and oil on the steps. He contends that this condition had existed for an appreciable period of time. Thus, he says, the Railway, as the owner and operator of the tug, was negligent and the vessel was unseaworthy. He further contends that he was doing the traditional work of a seaman and is, therefore, en-

titled to rely upon the warranty of seaworthiness.

The Railway argues that (1) the tug was temporarily withdrawn from navigation, (2) Schell was not a member of the crew of the tug but, on the contrary, was a shore-based worker employed and acting as a machinist helper at the time of the accident, (3) Schell was not performing work traditionally done by members of the crew of a harbor tug and, in addition, such crew did not possess the proper tools or competence to perform such work, and (4) while admitting that the steps were not completely free of grease or oil, there was no negligence and the tug was not unseaworthy, bearing in mind the nature of the repair work being carried on aboard the tug at the time in question.

When he sustained his injury, Schell was 62 years of age and weighed approximately 255 pounds. He had been employed by the Railway for nearly 25 years. He describes a part of his duties as a machinist helper as follows:

"You clean up what you're working on. After you finish, you clean up whatever—whatever mess you make on the boat, you clean it up."

Shortly after 10:00 A.M. on April 12, 1965, the foreman instructed Schell to go aboard the tug to "clean that platform off". After boarding the tug it was necessary for him to climb 5 steps to reach the subject platform around and behind the engine toward the stern of the tug. Armed with a lot of rags, two buckets, and a quantity of burlap, Schell had no difficulty ascending the steps and, as he described them, they were "okay". For slightly more than one hour, Schell was engaged in his cleaning operation which he described as "messing with oil, grease, and filled two buckets up and then I was going down to carry them over to the fire pit". He had not completed his work but decided to carry the buckets to the fire pit. He testified that he reached the head of the steps, put down the two buckets, and proceeded to take the burlap and "wiped my shoes off". He then claims to have "looked

around that step", following which he turned around and "backed down the steps". He states that he had his hands on both railings. Schell was then asked and replied:

"Q. Then what happened as you started to descend?

"A. Well, after I got on the second step, I slipped and my left leg went through the—from the second step and the top step up in my thigh, way above the knee, and the right one went over the side of the ladder."

After the accident, Schell noticed that there was black grease, about the size of a dollar bill, on the dark metal step.

The steps (or ladder) were constructed in much the same manner as a regular set of stairs, and not directly up-and-down. They were, as described, "slanted like house steps". There was a proper railing on each side of the steps.

It is conceded that the very purpose of Schell's boarding the tug was to clean up the grease and oil on the platform, caused by work recently performed.

While the tug docked at the pier on the afternoon of Friday, April 9, no work was commenced thereon until Monday, April 12, at 7:00 A.M.—the day that Schell was injured. The total time required to complete all of the necessary work was approximately 12 hours. The repairs were in the nature of "running repairs" performed solely by the marine mechanical department of the Railway. Within one hour after the work commenced at 7:00 A.M., it was inevitable that there was grease and oil on the platform and probably on the treads of the steps. The crankshaft had been removed from the tug and taken to the shop immediately prior to the accident, and it was following this removal that Schell was assigned the task of "cleaning up the mess". The witness, Lewis, testified the disassembling and removal of the crankshaft required about three hours, and this had been accomplished before Schell went aboard.

No crew members were aboard the tug from Friday afternoon until Tues-

day afternoon, April 13. No crew members ever lived or ate aboard the tug. Only members of the marine mechanical department visited the tug in the interim period between April 9 and April 13.

While the tug was not capable of immediate navigation during the time the crankshaft was removed from the tug, we do not believe that such a repair or renewal constitutes even a temporary withdrawal from navigation in the legal sense, bearing in mind that the control of the tug was never relinquished by the Railway. The repairs could properly be classified as minor or normal, even though the renewal of the worm gear and thrust rings had not previously been done for approximately 15 years. The authorities cited by the Railway all point to instances in which the vessel is being deactivated, reactivated, or undergoing major repairs or overhaul requiring more than a period of 12 hours to *place the vessel back in operating condition*.[1]

Having held that the tug was in navigation under the facts here presented, we have no difficulty in concluding that Schell was doing the traditional work of a seaman. All concede that seamen are occupied in cleaning following minor repairs. The mere fact that no seaman was aboard the tug—as the crew does not remain aboard when any repair work is to be done at the dock or in the shop—is of no consequence. The Railway's reliance upon Partridge v. Pope & Talbot, Inc., N.D.Cal., 1965, 257 F.Supp. 456, is misplaced as this involved an injury to a professional surveyor—obviously not doing the traditional work of a seaman. Cf. Noel v.

Isbrandtsen Co., 4 Cir., 1961, 287 F.2d 783. The authorities sustain Schell's argument that he was doing the traditional work of a seaman.[2]

The issue as to whether Schell can maintain an action against his employer, who is likewise the owner of the vessel, despite the provisions of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq., has been decided contrary to the Railway's contention in Biggs v. Norfolk Dredging Company, 4 Cir., 1966, 360 F.2d 360, in which the doctrine pronounced in Reed v. The S. S. Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448, has been expanded to include not only longshoremen engaged in loading and unloading, but also shore-based workers doing the traditional work of seamen. To now hold that the receipt of compensation benefits forecloses this action would invite a second reversal on the same point. Moreover, Pacific Inland Navigation Company v. Course, 9 Cir., 1966, 368 F.2d 540, is squarely in point on this issue.

Turning to the crucial point in the case, we look to the claims of negligence and unseaworthiness under the peculiar facts of this case. In Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, which did away with the theory of transitory unseaworthiness, we also find the following language:

"What has been said is not to suggest that the owner is obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use.

---

1. West v. United States, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (reactivation); McQuaid v. United States, 3 Cir., 1964, 337 F.2d 483 (complete overhaul under control of private shipyard); Latus v. United States, 2 Cir., 1960, 277 F.2d 264, cert. den. 364 U.S. 827, 81 S.Ct. 65, 5 L. Ed.2d 55 (reactivation); Noel v. Isbrandtsen Co., 4 Cir., 1961, 287 F.2d 783 (deactivation); United New York and New Jersey Sandy Hook Pilots Assn. v. Halecki 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.

2d 541 (vessel dead with generators dismantled); Raidy v. United States, 4 Cir., 1958, 252 F.2d 117 (vessel in drydock).

2. Torres v. The Kastor, 2 Cir., 1955, 227 F.2d 664; Crawford v. Pope & Talbot, Inc., 3 Cir., 1953, 206 F.2d 784; Van Carpals v. The SS American Harvester, 2 Cir., 1961, 297 F.2d 9, cert. den. 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 84, reh. den. 370 U.S. 914, 82 S.Ct. 1255, 8 L.Ed.2d 406.

The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service."

In *Mitchell,* the case was remanded for a new trial on the issue of unseaworthiness, thus indicating that this is a factual determination by the factfinder.

In Blier v. United States Lines Co., 2 Cir., 286 F.2d 920, cert. den. 368 U.S. 836, 82 S.Ct. 32, 7 L.Ed.2d 37, a seaman was boarding a vessel when he slipped on a grease smear on one of the steps leading from the top of the bulwarks of the vessel to the main deck. After quoting language from *Mitchell,* the court charged the jury in part:

"Seaworthiness is reasonable fitness for the particular voyage, or directed to the present case, *reasonable fitness for the particular uses which the plaintiff was making of the ship at the time of his alleged injury.*

"In considering whether the vessel was unseaworthy due to the presence of grease on the steps of the gangway, the following rules should be followed:

"A vessel is not unseaworthy by reason of a temporary condition, if even so the vessel was reasonably safe and suitable. In order to be seaworthy, a vessel need not meet a standard of perfection. It need only be *reasonably safe for the purpose to which it is to be put.*"

Subsequently, in Pinto v. States Marine Corporation of Delaware, 2 Cir., 296 F.2d 1, cert. den. 369 U.S. 843, 82 S.Ct. 874, 7 L.Ed.2d 847, the Second Circuit had this to say:

"So here, assuming the engine room steps were so constructed as to keep the hazard of oil accumulation to a minimum, most jurors would see a difference in seaworthiness as between a vessel whose well-constructed steps bore the oil accumulation of days and another whose similar steps had only a film of oil unavoidably accumulated since a cleaning a few hours before. We read Mitchell as saying they may nevertheless hold the owner liable in the latter case, not that they must. What Mitchell did forbid was the Court's instructing them to make any distinction based on whether the condition had or had not arisen until the voyage commenced, or on whether it had or had not been brought home to the owner."

While the Fourth Circuit appears to go further than the Second Circuit in considering the element of time, Grzybowski v. Arrow Barge Co., 4 Cir., 1960, 283 F.2d 481, it is nevertheless recognized that a factual issue is presented where it said:

"Similarly, in the case at bar, if the jury should find that there existed a slippery condition, even though transitory and immediate, resulting from the use of soap in the loading operation, the jury should determine further whether such conditions rendered the ship unseaworthy * * *."

This Court has been confronted with like situations in Williams v. Arrow Steamship Corporation, E.D.Va., 1963, 218 F.Supp. 595, and Greene v. S.S. Invicta, E.D.Va., 1964 A.M.C. 1531, aff'd per curiam, 338 F.2d 696. *Williams* involved both negligence and seaworthiness, whereas *Greene* was solely on negligence. However, the language in *Greene* is equally applicable here, where this Court said:

"With shipyard repairs being performed at the time, it is natural to assume that the steps and deck of the vessel were not as clean as when the ship is in operation. We know of no rule of law which requires the ship's crew to constantly follow workmen engaged in ship repairs by cleaning as the work is being done aboard the vessel."

■ Tested by the foregoing principles, we find that unseaworthiness, as applied to this case, is governed by the reasonable fitness of the vessel for the particular uses Schell was making of the

tug at the time of his injury. There are several unanswered questions such as if Schell was descending the steps backward according to company practice or rule, with both hands on the railing, how did he plan to take the two buckets to the fire pit? Nevertheless, the Court must find that Schell did slip on grease. Whether this grease happened to be on the step or on Schell's shoes is not clear from the record, especially since Schell testified that the steps were in a satisfactory condition when he ascended same, and there is no evidence that anyone used these steps while Schell was cleaning the platform. But, for the purpose of this opinion, we assume that grease was on the step prior to Schell's injury.

In Lind v. American Trading & Production Corporation, 9 Cir., 1961, 294 F.2d 342, a seaman slipped on deck while engaged in washing down the paintwork in a process known as "soogeeing" which involves mixing of water and strong soap powder. The Court concluded:

"(T)hat the performance of soogeeing by crew members in and of itself cannot render a vessel unseaworthy. It is a necessary, normal and recurring seaman's duty, and work that must be done on board and which is customarily done while the vessel is at sea, causing the deck within the working area to become necessarily slippery, with footing thereon unsteady, and requiring the seaman to be alert as to his footing."

Assuming the correctness of the ruling that the tug was in navigation, minor dockside repairs involving the accumulation of grease is inevitable and unavoidable. True, the Code of Federal Regulations provides that "slippery conditions on walkways or working surfaces shall be eliminated as they occur", but this language does not mean that a wiper must be ever present to remove all grease at the very moment the work is being done. We do not believe that Provenza v. American Export Lines, Inc., 4 Cir., 1963, 324 F.2d 660, cert. den. 376 U.S. 952, 84 S.Ct. 970, 11 L.Ed.2d 971, has any application to the facts of this case. The Railway did exactly what it was required to do, i. e., assign a man to "clean up the mess" as soon as the crankshaft had been removed. If Schell failed to clean it up, he was the architect of his own injury. The stairs were a matter of 3 feet from the platform where the "mess" existed. It was within the reasonable boundaries of the working area.

Schell argues that interrogatory No. 31 imposes liability upon the Railway. This interrogatory inquires as to the period of time the grease or oil had "been in the area" prior to Schell sustaining his injuries. The answer to this question stated: "For approximately 24 hours". Actually, all evidence points to the fact that no work was done aboard the tug until 7:00 A.M. on Monday, April 12, and that Schell sustained his injuries shortly after 11:00 A.M. on the same date. While we think that the interrogatory was "loosely" answered, even though we assume that there may have been grease in the area for a period of approximately 24 hours prior to Schell's fall, we do not believe that this was a causative factor in light of the uncontradicted testimony that the dismantling of the crankshaft necessarily caused a large accumulation of grease and oil in the general area.

Schell relies upon this Court's decision in Pitsillos v. The S.S. George, E.D.Va., 1959, 176 F.Supp. 351, aff'd sub nom. Puerto Segura Cia. Naviera, S. A. v. Pitsillos, 4 Cir., 1960, 279 F.2d 599. That case involved oil on the floor of a galley which had accumulated as a natural consequence of permitting the use of the galley by seamen during night hours with no party being charged with the responsibility of cleaning the galley floors, etc.

This Court is not denying recovery to Schell on the mere fact that he slipped and fell in a condition which he had been sent aboard the tug to correct. We realize that in Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, a ship's carpenter had been

sent aboard the vessel to make minor repairs on grain loading equipment and, while so occupied, slipped and fell through an uncovered hatch hole. While *Hawn* does not involve the specific question as to a workman falling in the very condition he was required to correct, the doctrine of unseaworthiness is inferentially broad enough to cover this issue.

Finding that under all the circumstances of this case there was no negligence on the part of the Railway and no unseaworthiness of the tug, a decree may be presented dismissing the libel.