Samuel J. ROGERS, Plaintiff,

v.

GRACEY–HELLUMS CORP., Argonaut
Insurance Company, Defendants.

Civ. A. No. 70–7.

United States District Court,
E. D. Louisiana,
New Orleans Division.

Dec. 2, 1970.

Donald G. Cave, David L. Ray, Edwins & Cave, Baton Rouge, La., for plaintiff.

Charles J. Hanemann, Jr., O'Neal, Henderson, Hanemann & Morris, Houma, La., for defendants.

ALVIN B. RUBIN, District Judge:

On April 22, 1968 rig no. 4 of the Gracey-Hellums Corporation was on location to drill a well in the navigable waters of Louisiana. While the crew was working to remove and replace a damaged part, a sliver of metal entered the right eye of Samuel J. Rogers, a roughneck on the rig. Rogers sued Gracey-Hellums, his employer, and Argonaut Insurance Company, insurer of Gracey-Hellums, for damages under the general maritime law and the Jones Act, 46 U.S.C. sec. 688, for maintenance and cure, and for punitive damages. Rogers later stipulated that he was not entitled to punitive damages and that the defendants had met all their obligations to afford him maintenance and cure. So only his demands for damages are at issue. The plaintiff waived his right to trial by jury, and the case was tried without a jury.

Rig no. 4 is a submersible inland drilling barge. Lacking motive power, it is towed to and from locations by tug. Once the barge is on location, its crew opens seacocks, allowing water to enter the hull and causing the barge to sink to the bottom. To leave a location, its crew pumps out the hull and refloats the barge. At no time is the barge attached to the bottom by rip-rap, shells or the like. The Court finds that the barge was a vessel. Producers Drilling Co. v. Gray, 361 F.2d 432 (5th Cir. 1966); Offshore Co. v. Robison, 266 F.2d 769 (5th Cir. 1959).

The duties of roughnecks on the barge included making it up to the tug and casting off from the tug, as well as their normal duties in the drilling operations. The plaintiff, a relatively new hand, was never on the barge when it moved, but, if he had been, he would have been required to perform such duties. The plaintiff ate, slept and worked on the barge, and was more or less permanently attached to it. The Court finds that the plaintiff was a member of the crew of rig no. 4, and therefore entitled to protection under the Jones Act and to a warranty of seaworthiness under the general maritime law. Producers Drilling Co. v. Gray, supra; Offshore Co. v. Robison, supra.

A brace of four engines delivers power to the drawworks and rotary through a series of roller chains geared to shafts. The engines, which together can generate some 2200 horsepower, are called upon to lift loads in excess of 500,000 pounds. The roller chains are of the type used on bicycles, but much larger, heavier and stronger.

It became necessary in the course of the drilling operation to change a large shaft in the drawworks known as the jackshaft, which had become bent. Before the jackshaft could be replaced, the chains connecting the jackshaft to the engines and to other shafts had to be

removed. The driller assigned Jimmie Bertrand, another roughneck, to remove one of the chains and assigned the plaintiff to help him.

At first Bertrand tried to pry the plates of the chain apart with a screwdriver, while the plaintiff stood right next to him assisting in the task. Meeting with no success, Bertrand obtained from a nearby tool rack a ball peen hammer, a steel punch, and a pair of safety goggles. Bertrand then attempted to pry the plates apart with the punch, with the plaintiff still right next to him. Still meeting with no success, Bertrand donned the safety goggles and proceeded to separate the plates by wedging the punch between them with the hammer. As soon as Bertrand started striking the punch with the hammer, the plaintiff, without donning safety glasses, though by his own admission they were readily available to him, moved some ten feet away from Bertrand. After Bertrand had hammered for a short while, a small sliver of metal flew from the hammer, the punch, or the chain, into the plaintiff's right eye.

## UNSEAWORTHINESS

Many tasks on a drilling rig require that metal be impacted against metal. Bertrand and the plaintiff were engaged in one of them. The evidence is abundantly clear that, whenever metal strikes metal, there is a possibility that a sliver may fly off. This creates a hazard. But we know from Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S. Ct. 926, 4 L.Ed.2d 941 (1960), and a host of other cases that a vessel need not be "accident-free." "The standard is not perfection, but reasonable fitness * * *" Mitchell v. Trawler Racer, Inc., 362 U.S. at 550, 80 S.Ct. at 933. The warranty of seaworthiness extends to tools. Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960). But, like the ship itself, the tools need not be perfect, but rather reasonably fit. Molitor v. American President Lines, 343 F.2d 217 (9th Cir. 1965).

There are certain hazards which are ordinary, and not unreasonable. "[M]en who make their livelihood on the water can be expected to cope with some of the hazardous conditions that must prevail even on a seaworthy vessel." Jones v. Moore-McCormack Lines, Inc., 291 F.Supp. 888, 890 (S.D.N.Y.1968). See also Lind v. American Trading & Production Corp., 294 F.2d 342 (9th Cir. 1961); Williams v. Arrow S. S. Corp., 218 F.Supp. 595 (E.D.Va.1963); Creppel v. J. W. Banta Towing Inc., 202 F.Supp. 508 (E.D.La.1962); Colon v. Trinidad Corp., 188 F.Supp. 97 (S.D. N.Y.), amended 188 F.Supp. 803 (1960). A sliver did fly. But from all the evidence, the court finds that, when even reasonably fit metal tools strike one another or some other metal object, slivers are apt to fly. Slivers may not fly every time, but it is to be reasonably expected that sometimes they will. There is not a scintilla of evidence that the tools or chain were not reasonably fit for their intended purposes. The possibility of flying slivers, of course, creates a hazard. But the Court finds that the hazard was ordinary and not unreasonable, and was one which the plaintiff, as will be shown below, was able to cope with.

The plaintiff suggests that the barge was unseaworthy because the method of operation was unsafe, and that the equipment, even if not unsafe, was misused. See, e. g., Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1957); Crumady v. Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); Marshall v. Ove Skou Rederi A/S, 378 F.2d 193 (5th Cir.), cert. denied 389 U.S. 828, 88 S.Ct. 86, 19 L.Ed.2d 84 (1967). All the evidence shows that the method of operation was the proper one, and that Bertrand was not misusing the gear. While the plaintiff is correct that adherence to a custom does not show *ipso facto* that the method of operation was proper, June T., Inc. v. King, 290 F. 2d 404 (5th Cir. 1961), the evidence here shows not only that the employer adhered to custom, but that in doing so it used the proper method of operation.

The plaintiff suggested that, because the jackshaft bent, the barge was unseaworthy. The evidence indicates that this was a normal equipment failure that occurred after long usage. The mere failure of equipment, necessitating that seamen repair it, does not of itself render the vessel unseaworthy. Regardless, it was not the shaft that proximately caused the injury.

The plaintiff suggested that the vessel was unseaworthy because the chain was fastened tightly or was "in a bind." All the evidence on this point shows that for the chain to serve its intended purpose it had to be in a bind. The condition was normal and expected, and did not make the chain less than reasonably fit for its intended purpose.

The plaintiff suggests that the vessel was unseaworthy because he himself was an inexperienced hand. This condition will be treated later as it relates to the shipowner's duty of care, but any claimed lack of experience on the plaintiff's part did not render the barge unseaworthy. Were it otherwise, then no one could ever become a seaman. In any event, as will be shown below, the plaintiff was aware of the dangers involved and of the precautions to take against them, so that any lack of experience on his part was not causally related to the accident. It is true that a vessel may be unseaworthy if its crew is proved to be inadequate in number or competence to do their intended job. Boudoin v. Lykes Bros. S. S. Co., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955); June T., Inc. v. King, *supra*. But there is no such proof here.

The Court finds that Gracey-Hellums rig no. 4 was seaworthy.

## NEGLIGENCE

Under the Jones Act, even the slightest negligence of the employer which causes injury to a seaman renders the employer liable. Rogers v. Missouri Pacific R. R., 352 U.S. 500, 77 S. Ct. 443, 1 L.Ed.2d 493 (1957). The Court finds negligence, though slight, on the part of the employer in failing to instruct the plaintiff in the use of goggles and to adopt and enforce regulations to require their use.

The evidence is clear that the goggles were available. But the plaintiff was never instructed by this employer to wear them. And there was no general policy requiring the use of goggles. The toolpusher testified that, if he saw a man without goggles a few feet from work in progess, he might or might not insist that the man comply with the company's rule requiring the use of goggles.

The evidence shows that the employer was not negligent in furnishing the tools it furnished, in selecting the method of operation, or in performing the work at hand. There is no showing that the place afforded plaintiff to work was not reasonably safe.

The plaintiff suggested that the employer was negligent in failing to erect some kind of shield around the work site. The work of impacting metal on metal occurs all over a drilling barge. There is no evidence to suggest that installation of such shields is even possible, much less practical. To the contrary, the court finds that the best precaution was the one made available here: safety goggles. If plaintiff had worn them, a shield would not even have to be considered. Indeed, there is no evidence that the use of a shield would have prevented the accident. The trajectory of the sliver is unknown, and there is no suggestion of the type or configuration of the shield which plaintiff suggests. So there is no way of knowing if a shield would have deflected the sliver.

## CONTRIBUTORY NEGLIGENCE

Though the Court finds the employer guilty of slight negligence, it finds the plaintiff guilty of gross contributory negligence. The primary cause of this accident was really the plaintiff's own failure to take proper precautions for his own safety. The employer should have instructed the plaintiff about these safety precautions, but the plaintiff already knew about them. The plaintiff may have been inexperienced on the drilling barge, but he had spent four years

in the Navy, where he had occasion to wear goggles on similar jobs in compliance with the Navy's safety regulations. His own testimony is that before the accident he was aware of the danger that slivers can fly off when metal is impacted on metal, and aware that safety glasses should be worn to protect against that danger.

The Court is not able to accept entirely the plaintiff's version of the accident. The plaintiff would have the Court believe that, before Bertrand returned with the tools and goggles he, the plaintiff, had moved off and that he was just standing by, looking away from the work. The Court finds that only after Bertrand had come back from the tool rack, put on his goggles, and started hammering, did the plaintiff move some ten feet away. The plaintiff was not divorced from Bertrand's work. He was assigned to help Bertrand, his attention was directed to what Bertrand was doing, and he was directly engaged in the task.

The plaintiff had every reason to take care of his own safety, and failed to do so. Instead of using goggles, as he easily could have and knew he should have, he chose the unsafe and ineffective expedient of moving back.

The Court therefore finds that the negligence of the plaintiff contributed to his injuries in the amount of two-thirds. His award will be reduced accordingly. Palermo v. Luckenbach S. S. Co., 355 U.S. 20, 78 S.Ct. 1, 2 L.Ed.2d 3 (1957); Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1954).

### QUANTUM

After the sliver entered the plaintiff's eye, he received first aid from Dr. Young, a general practitioner in Abbeville. The plaintiff then sought treatment by Dr. Bourgeois, an ophthalmologist in Houma. Dr. Bourgeois ascertained that there was a foreign body in the eye and referred the plaintiff to Dr. Schoel, an ophthalmologist in New Orleans. Dr. Schoel hospitalized the plaintiff and surgically removed the sliver. After five days in the hospital, the plaintiff returned to his home and remained under the care of Dr. Schoel and Dr. Bourgeois as an out-patient.

The pain endured by the plaintiff was severe at first, but rapidly diminished after the sliver was removed. By the time the bandages were removed, some three or four weeks later, the pain had virtually ceased. The plaintiff suffered no significant complications during the course of his convalescence.

The only residual disability is loss of useful vision in the right eye. No other member or bodily function is affected. The reason for the loss of vision in the right eye is that a cataract or scar has formed on the lens where the sliver pierced it. Dr. Schoel estimated that surgical removal of the lens affected by the cataract would have a seventy-five per cent chance of improving the vision in the plaintiff's right eye, possibly to 20/20, without appreciable risk to the plaintiff's health or existing vision. Dr. Schoel advised removal. Successful removal of the cataract would leave the plaintiff with some visual impairment because he would have to wear a contact lense to replace the natural lense affected with the cataract.

The plaintiff, now twenty-three years old, was earning $2.90 per hour as a roughneck. He returned to work four months after the accident, but not as a roughneck. He now works for the same employer as a roustabout, earning $1.93 per hour. But the Court is not satisfied from the evidence that the plaintiff cannot now return to work as a roughneck. The Court believes that he can return to work as a roughneck whenever he so chooses. As concerns the plaintiff's day-to-day activities, his testimony shows that he goes about them all with only a minimum of difficulty.

It is impossible to assess with mathematical certainty the damages with respect either to loss of earnings or to pain, suffering and disability. They are in large measure imponderables left to the discretion of the Court. For pain, suffering and loss of the eye, the Court

assesses damages at $20,000.00. For future loss of employment and earning capacity, the Court assesses damages at $15,000.00. That assessment is not based on the thesis that the plaintiff cannot return to work as a roughneck; the Court believes he can. But the plaintiff will always be handicapped to some degree, and in times of less employment he will be less preferred as a workman. The Court concludes that the fair value of these effects of the plaintiff's injury, though imponderable and difficult to measure, is $15,000.00. For future medical expenses in connection with removal of the cataract, the Court assesses damages at $1,500.00; for loss of earnings to date, at $2,500.00; and for loss of earnings during future convalescence, $1,000.00. The total damages are assessed at $40,000.00, subject to reduction by two-thirds because of the plaintiff's contributory negligence.

This opinion will serve as the Court's findings of fact and conclusions of law in accordance with Rule 52(a), Fed.R. Civ.P.